Dennis V. VOHS, Plaintiff-Appellant,

v.

Ronald W. DICKSON, Defendant-Appellee.

Elizabeth N. WHITAKER, II, Plaintiff-Appellant,

v.

Ronald W. DICKSON, Defendant-Appellee.

No. 73–1498.

United States Court of Appeals, Fifth Circuit.

June 7, 1974.

See also, D.C., 321 F.Supp. 814.

Fred L. Somers, Jr., Atlanta, Ga., for plaintiffs-appellants.

Richard R. Cheatham, Atlanta, Ga., for defendant-appellee.

Before GODBOLD, DYER and GEE, Circuit Judges.

GEE, Circuit Judge:

Appellants Vohs and Whitaker brought suit in the United States District Court in the Northern District of Georgia, complaining that appellee Dickson violated both state and federal securities laws in his sale of stock to them. In a well-reasoned opinion, the district court found that the plaintiffs were entitled to no relief. We agree and affirm.

The case was tried upon the following stipulation of facts, from which we have edited only the few portions irrelevant to this appeal:

"1.

"Management Science America, Inc. ('MSA') is a Georgia corporation which

was at all times relevant, engaged directly and through various subsidiaries in computer and data processing systems design on a consulting basis, in the design and marketing of computer software packages and in the operation of computer and data processing centers in twelve (12) states, the District of Columbia and in England. The principal offices and executive offices of MSA are located in Atlanta, Georgia. During the period from November, 1968 through May, 1969, MSA employed in the range of 300 to 700 people in various aspects of its operations.

\* \* \* \* \* \*

"MSA did not file a registration statement with the Securities and Exchange Commission either registering itself as a company or its securities, nor was a registration statement filed with the Commissioner of Securities for the State of Georgia by MSA. Certain exemption applications were filed on behalf of MSA for exemption from registration pursuant to the Georgia Securities Act of 1957, as amended, with the Georgia Commissioner of Securities.

"2.

"Defendant, Ronald W. Dickson, is a 1955 Phi Beta Kappa, magna cum laude graduate of Duke University (B.A. in Economics), and on August 1, 1966 was employed as the 15th employee by MSA. MSA was a pretty close knit group and most everybody knew everybody else. Dickson was interviewed for the job with MSA by Tom Newberry, then President of MSA and Jean Mori, another MSA officer. Dickson was hired as a data processing consultant in Charlotte, North Carolina, which involved the programming of computers and systems analysis work. Dickson was given the title of associate in 1966. This involved no increase in his responsibilities or authority. The sequence of titles in MSA was Associate, Senior Associate and then Vice President or some other officer. Dickson continued to live and work in the Charlotte, North Carolina area until he was terminated by MSA in October, 1969. During his employment by MSA, Dickson did not attend meetings of the officers or Board of Directors of MSA or periodic planning or other meetings of account managers (except for a single monthly meeting occurring in the Fall of 1968 at which bills were prepared) and served on none of MSA's management committees. Dickson attended the annual meeting of MSA stockholders in April, 1969.

"During his tenure with MSA, Dickson reported to several different persons including the following: Matt Maddin, Vice President in charge of Midwest Operations, John Locklear in charge of the Charlotte, North Carolina office; Ronald J. LaChance, Secretary-Treasurer and Fred Pattison, Senior Associate in charge of Banking Software Packaging.

"One of Dickson's responsibilities encompassed project management of the development of a financial information and control system. Dickson reported to Fred Pattison in this project. The plaintiff, Vohs, reported directly to the defendant, Dickson, and the plaintiff Whitaker, reported to the defendant, Vohs.

"3.

"Plaintiff Elizabeth N. Whitaker is a graduate of Duke University. Upon her graduation she was employed for five years by the Wachovia Bank in Winston-Salem, North Carolina where she was assistant to the budget director, the administrator of employee benefits, and where she also worked on a management information system. From November, 1967 until February, 1969, Miss Whitaker was employed as a cost accountant by the First National Bank in Atlanta. In February, 1969, on the recommendation of the defendant Dickson, (who had first met Miss Whitaker when they were both working at Wachovia), Miss Whitaker was employed by MSA as a project engineer to design a financial information and control system. In this capacity, Miss Whitaker's immediate superior

was Dennis Vohs, the other plaintiff in these actions.

## "4.

"Miss Whitaker's brother, John Whitaker, is a graduate of the Harvard Business School and was and is the president of Strategy, Inc., a corporation which operates both as a securities broker and as a hedge fund in purchasing and selling new issues and unregistered stock in small but growing companies, of which MSA was one, for its own account and in the case of MSA stock for certain persons who purchased the MSA stock from Strategy, Inc. Including her equity interest in Strategy, Inc., Miss Whitaker had approximately $200,000 in personal stockholdings during the period involved in this action.

## "5.

"Plaintiff, Dennis Vohs, is a graduate of Georgia Institute of Technology and worked for IBM as a Systems Engineer during the two years preceding his employment in September, 1968, by MSA. Vohs was initially employed by MSA in Atlanta in September, 1968 as a Data Processing Specialist, and in February, 1969, was promoted to the position of Data Processing Consultant. During April and May, 1969, Vohs was the project leader of a group involved in the development of a data processing program for the Trust Company of Georgia, reporting to the defendant, Dickson, who was the Project Manager.

## "6.

"In November of 1967, prior to Miss Whitaker's and Mr. Vohs' employment by MSA, MSA granted options to its employees to purchase a limited number of shares of its $1.00 common stock at $56.00 per share. Dickson was given an option to purchase 30 shares and did so on December 8, 1967. In connection with this purchase, Dickson executed an investment letter and an affidavit stating his intention to purchase such shares for investment and hold them for

a period of at least 12 months. Dickson also executed a stockholders' agreement giving MSA the right to purchase the shares should Dickson leave its employ.

## "7.

"On or about February 20, 1968, the defendant Dickson purchased 500 shares at a purchase price of $2.50 per share.

## "8.

"Subsequently, the common stock of MSA was split 100 for 1 and 3,000 shares of $0.01 per value common stock were issued to Dickson in exchange for the 30 shares originally purchased by him. On June 29, 1968, the stockholders of MSA authorized certain officers and key personnel to purchase for cash, up to 2,200 shares at $5.00 per share between July 15, 1968 and August 1, 1968. On August 1, 1968, Dickson was allowed to purchase an additional 500 shares of the new one-cent par value stock at a price of $5.00 per share pursuant to Stock Option Plan adopted in 1965 for MSA employees. Dickson also executed an investment letter and affidavit in connection with this purchase.

## "9.

"On September 27, 1968, MSA applied for and received from Ben W. Fortson, Jr., Secretary of State, an exemption under § 6(j) of the Georgia Securities Act covering its prior sales of stock to certain named employees, including the 30 shares sold to Dickson on December 8, 1967, but not including the 500 shares purchased by Dickson on February 20, 1968, nor the 500 shares purchased by Dickson on August 1, 1968.

## "10.

"On September 30, 1968, MSA sold 140,000 shares of its common stock in an unregistered private placement at $12.00 per share through The Robinson-Humphrey Company, Inc., as agent. This private placement was part of a proposed stock offering first announced to all MSA stockholders on July 24, 1968

by Thomas L. Newberry, then President of MSA. The proposed financing consisted of the private placement and a $5,000,000 public offering of MSA stock in January or February, 1969. Some of the MSA stock to be publicly offered would be reserved for employees of MSA.

"11.

"In December of 1968, in a memorandum circulated from LaChance, MSA announced to its employees that it was still MSA's intention to have a public offering of MSA common stock during early 1969. Most likely the offering will take place in April or May, 1969.

"12.

"At some time late in 1968 or early 1969, prior to her employment by MSA, Miss Whitaker had been told by Mr. Dickson that he thought that MSA stock was a good buy. Mr. Dickson did not then offer to sell Miss Whitaker any stock or suggest that she might be able to buy some, but said that he would recommend that her name be placed on a list of potential stockholders maintained by Ron LaChance, the Secretary-Treasurer of MSA, who would be given preference in the proposed public offering of MSA stock. At the time of her employment by MSA, Miss Whitaker asked whether she would be given the opportunity to purchase stock in MSA and was told that options were given to key employees.

"13.

"During the period from September, 1968, through May of 1969, there was a considerable amount of discussion on the price of the stock when it went public. According to Mr. Vohs, 'Everybody thought the company was going to be successful, rumor-wise, and that was, you know, the type of information, the conjectures as to what the price of the stock would be when it went public and things of that nature.' Miss Whitaker described the level of the conversation among the MSA employees about the anticipated public offering as 'medium conversation,' but testified that she does not recall any discussion about the possible price at which the stock might be sold to the public.

"14.

"On December 18, 1968, Dennis Vohs was granted an option to purchase 100 shares of MSA common stock at $21.00 per share which was recited in the option agreement as being 'the fair market value per share of the stock on the date the option was granted.' This option could not be exercised for 2 years. On March 8, 1969, Vohs was granted a second option to purchase an additional 300 shares at $25.00 per share, the recited fair market value on that date. Like the first, this option could not be exercised by Vohs for a two-year period. . . . . MSA did not grant Miss Whitaker any options to purchase its stock.

"15.

"During March and April of 1969, Miss Whitaker discussed her desire to purchase MSA stock with Dennis Vohs and with Fred Pattison who was the superior to Mr. Dickson, Miss Whitaker and Mr. Vohs reported. Mr. Pattison was optimistic about the future prospects of the company and told Miss Whitaker that if he could not get stock from the company through options, he was interested in purchasing some from another source. Miss Whitaker, informed by Vohs that Vohs had talked with LaChance about MSA stock, agreed with Vohs and Pattison to undertake a joint effort to find someone who would be willing to sell MSA stock to herself, Vohs and Pattison. In March of 1969, Miss Whitaker learned from LaChance that a public offering of MSA stock would not be made in the Spring of 1969. LaChance told Miss Whitaker that part of the reason why MSA would not go public in the Spring of 1969 was confidential, but that part of it had to

do with the fact that MSA had not met Robinson-Humphrey's guidelines.

## "16.

"Miss Whitaker then initiated discussions with Mr. Dickson regarding the purchase of MSA stock and asked Mr. Dickson to help her find someone who would sell her MSA stock.

## "17.

"Mr. Dickson (who then owned 4,000 shares or approximately 0.2% of MSA's 1,645,000 outstanding shares) was not interested in selling his own stock in MSA and did not solicit any sales. At Miss Whitaker's request, he called several fellow employees and asked them if they wanted to sell their stock in MSA. Dickson called Jim Standard in New Jersey, Paul Friedman in California, and Reid Henson and Richard Ward in Atlanta. All declined to sell and expressed the belief that the stock was going up considerably in value and that it would be unwise to sell at that time. Dickson reported to Miss Whitaker his inability to locate anyone who would be willing to sell the stock.

## "18.

"In late March, 1969, Miss Whitaker called Ronald J. LaChance and asked whether he knew of anyone who would sell her stock in MSA. Mr. LaChance indicated that he would get back in touch with Miss Whitaker and did so around April 10, 1969, but Mr. LaChance did not know of anyone at that time who wished to sell MSA stock.

## "19.

"Ronald J. LaChance was at all times relevant the Secretary-Treasurer of MSA. In his capacity as secretary Mr. LaChance was the transfer agent of MSA stock, and records of ownership of shares in MSA were maintained under his supervision. Prior to April, 1969, Mr. Dickson had worked with Mr. LaChance on one or more computer application projects for clients of MSA in-

cluding in excess of 10 trips to Elkin, North Carolina beginning in the spring of 1969, but they did not visit in each other's homes.

## "20.

"Early in April, Miss Whitaker asked Dickson about the financial status of the company and as to whether purchasers of MSA stock were required to sign an investment letter. Mr. Dickson stated that he did not know the answers to her questions and recommended that she talk to the Secretary-Treasurer of the company, Mr. LaChance, and to the Vice President of Finance, Mr. Hudson. According to Miss Whitaker:

Well, Mr. Dickson, being in Charlotte, said he did not know the financial status of the company and for me to get that type of information from Mr. LaChance.

"Dickson took Miss Whitaker over to Mr. LaChance's office and introduced her to LaChance, to whom she had previously spoken on the telephone but whom she had not previously met. After introducing Miss Whitaker to Mr. LaChance, Dickson then left. At this initial meeting, Miss Whitaker again asked LaChance if he knew anyone who would sell MSA stock to her. LaChance replied that he did not.

## "21.

"During the first conference with LaChance, Miss Whitaker asked for, but was refused a copy of the 1968 MSA Annual Report on the ground that the information was confidential. Following the first conference with LaChance, Miss Whitaker asked Dickson to give her a copy of the 1968 MSA Annual Report which Dickson testified was the only financial information regarding MSA which Dickson had. Following the first meeting with LaChance, Dickson gave Miss Whitaker a copy of the 1968 Annual Report which she had requested. Neither Dickson nor LaChance ever explained to Miss Whitaker the 1968 Annual Report of MSA nor did Miss Whi-

taker ask that either of them do so. Miss Whitaker states that the footnotes to her were very vague as to the true status of the company. Miss Whitaker, in turn, mailed a copy of the report to her brother, John Whitaker. At Miss Whitaker's request, Mr. Dickson also provided Miss Whitaker with a copy of an opinion letter dated April 8, 1969, which Mr. Dickson had received from . . . an attorney . . . regarding Dickson's right to sell his shares in MSA without registration and to have the shares transferred on the books of the company.

### "22.

"At least a week following the first meeting between Miss Whitaker and LaChance, but still in April, Miss Whitaker and Mr. Vohs went to LaChance's office for a second time and asked for financial information about MSA. Mr. Dickson was not present at this meeting. A large portion of the conversation related to the transfer of the stock and their ability to buy it.

### "23.

"On several occasions during April and early May, 1969, Miss Whitaker sought the advice of her brother, John Whitaker, whom she believed to be experienced and knowledgeable in the securities field. Miss Whitaker discussed MSA's 1968 Annual Report with her brother on at least one occasion, particularly the revenue figures and certain footnotes to the financial statements which she did not understand.

### "24.

"In the initial stage of her discussions with Mr. Dickson, Miss Whitaker did not advise Dickson that Vohs and Pattison were also interested in purchasing MSA stock. Between April 22 and April 29, 1969, following her second meeting with Mr. LaChance (which Mr. Vohs also attended), Miss Whitaker discussed a possible sale of MSA stock by Dickson on several occasions and Miss Whitaker

gave Mr. Dickson a copy of an opinion letter she had obtained (at Mr. La-Chance's suggestion), from her family's lawyer, . . . dated April 21, 1969, regarding the legality of a purchase of MSA stock by Miss Whitaker. Dickson stated that [this] letter was used by him as the 'final thing that influenced [his] decision about the correctness and legality of this sale.' But Dickson was still reluctant to sell any of his MSA stock and initially offered to sell Miss Whitaker only 1,000 shares at $30.00 per share. At this point, Miss Whitaker disclosed that Mr. Vohs was also interested in purchasing a portion of Mr. Dickson's shares and asked Mr. Dickson if he was willing to sell any more. Dickson was reluctant to sell and did not reply immediately, but after thinking about it, finally agreed to sell Miss Whitaker 3,000 shares of his MSA stock at $30.00 per share.

"It was tentatively agreed between Miss Whitaker, Mr. Vohs and Mr. Pattison that Miss Whitaker would take 1,500 shares, Mr. Pattison 1,000 and Mr. Vohs 500. Vohs and Pattison also indicated that if Miss Whitaker could get more stock at $30.00 per share, they would purchase it. At this point, Miss Whitaker had still made all the arrangements and had had all the dealings with Mr. Dickson, who had not discussed the sale with either Mr. Vohs or Mr. Pattison. Dickson first learned of Vohs' interest about April 20–24, 1969 when Miss Whitaker asked Mr. Dickson if he had any objections to Mr. Vohs' taking 500 shares of the 3,000 shares of MSA stock which she had agreed to purchase from Dickson and Dickson stated that he did not.

### "25.

"Dickson presented his Certificate No. 229 for 3,000 shares of MSA stock to Ron LaChance for reissue into smaller denominations on May 1, 1969. Shortly after reaching an agreement with Miss Whitaker, Mr. Dickson obtained from Mr. LaChance, specimen contracts and several weeks later forwarded them on

May 5, 1969 to Miss Whitaker who in turn mailed them to her family's lawyer. . . . [The lawyer] prepared new contracts and forwarded them to Miss Whitaker.

"26.

"The first contact between Mr. Vohs and Mr. Dickson regarding MSA stock occurred in early May when Dickson called Vohs to arrange a closing date. Since Mr. Vohs, Mr. Dickson and Miss Whitaker were scheduled to work together in Charlotte the next week, it was agreed that the sale would be closed at Mr. Dickson's office in Charlotte on May 7, 1969.

"27.

"On May 5, 1969, John Whitaker met with Ronald LaChance at the office of the latter in Atlanta, and orally agreed to purchase 2,500 shares of MSA stock from Mr. LaChance on behalf of Strategy, Inc. at $33.33 per share. This was the first contact between Mr. LaChance and Mr. Whitaker at which MSA was discussed. Following this meeting, Miss Whitaker again discussed MSA with her brother.

"28.

"On May 7, 1969, Mr. Dickson, Mr. Vohs and Miss Whitaker met at Mr. Dickson's office in Charlotte, North Carolina to close the transaction. Miss Whitaker brought the documents which had been prepared by her brother's lawyer [the 'family' lawyer]. These contracts were executed without modification by Miss Whitaker, Mr. Vohs and Mr. Dickson, and Mr. Dickson delivered the certificates and copies of the MSA Annual Report to the purchasers but a copy of the By-Laws was not furnished at this time by Dickson although called for in the contract. Mr. Dickson did not apply to the Georgia Commissioner of Securities for any exemption of the sale to Miss Whitaker and Mr. Vohs from registration. . . . .

"29.

"At the time of the closing, there was a conversation between Mr. Dickson, Miss Whitaker and Mr. Vohs as to whether Mr. Dickson might be able to locate someone who would be willing to sell Miss Whitaker and Mr. Vohs an additional 1,500 shares of MSA stock. Several weeks later, Miss Whitaker prepared a statement requested by Dickson agreeing to purchase an additional 1,000 shares of MSA stock through Mr. Dickson at a price of $33.33 per share before May 31, 1969 and forwarded the same to Mr. Dickson. Mr. Vohs prepared a similar statement requested by Dickson agreeing to purchase 500 shares of MSA stock at $33.33 per share prior to May 31, 1969 as requested by Mr. Dickson.

"30.

"Mr. Vohs and Miss Whitaker subsequently found, through Fred Pattison, that they could purchase MSA stock from Robert Jones at $25.00 per share. After talking to Mr. Jones, Miss Whitaker and Mr. Vohs agreed to purchase the additional 1,500 shares from him at $25.00 per share. Vohs thereafter refused to purchase the shares through Mr. Dickson.

"31.

"At Miss Whitaker's request, however, Mr. Dickson arranged for the purchase of 500 shares of MSA stock by Miss Whitaker's mother from another MSA employee, Bill Booth, at $33.33 per share, and this transaction was completed in a meeting between Miss Whitaker and Mr. Booth in June, 1969, with Dickson being the contact man.

\* \* \* \* \* \*

"33.

"At no time during the negotiations which led to the sale of MSA stock on May 7, 1969, did Mr. Dickson directly make any untrue, false or misleading statement to Miss Whitaker or Mr. Vohs in connection with the sale of MSA

stock which is the subject of this litigation, nor did anyone else do so with his knowledge. Mr. Dickson testified, in essence, that he did not withhold or omit any relevant information regarding MSA or its securities which was known to him at the time of the sale of the securities to the plaintiffs. Miss Whitaker and Mr. Vohs testified that they did not know whether this was true or not.

"34.

"In December, 1969, Dickson sold 1,000 shares of MSA common stock to a Douglas Jackson, then residing in Charlotte, North Carolina, to clear out his holdings in MSA since 'the stock was going down considerably and it was appropriate to take a loss.' Following the sale to Jackson, Dickson owned no other stock of MSA, the sale to Jackson having comprised the last 1,000 shares of the MSA stock owned by Dickson. Dickson did not apply to the Georgia Commissioner of Securities for any exemption from registration of the sale to Mr. Jackson.

"35.

"The parties have not stipulated any facts relating to the authority or knowledge of Mr. LaChance or of any statements which he may or may not have made to Miss Whitaker or Mr. Vohs, since there is or may be material disagreement among the parties as to some or all of these issues. These issues need not be reached if the Court holds that LaChance was not Dickson's agent in connection with the matters involved in this litigation. If, however, the Court holds that LaChance was Dickson's agent in connection with LaChance's meetings with Miss Whitaker and Mr. Vohs (or concludes that testimony is necessary in order for the court to determine the agency issue), the issues of

fact relating to such meetings will have to be tried separately by the Court.

"36.

"The defendant stipulates that the means or instrumentalities of interstate commerce were used in connection with the subject matter of these complaints and does not insist upon his defenses based upon the absence of any use of interstate commerce or the mails."

Since our evaluation of the legal issues is substantially in harmony with that of the district judge, we have drawn extensively from his opinion in composing ours which follows.

I.

## DEFENDANT'S SALE DID NOT VIOLATE GEORGIA SECURITIES LAW.

Appellants assert that Dickson violated the Georgia [1] "Blue Sky Law" in effect at the time of the transaction, Ga. Code Ann. § 97–101 et seq.[2]

The MSA stock involved in the sale was not registered. Sales of unregistered securities are generally unlawful under § 97–104 of the Georgia Code. Sales in violation of the state securities act are voidable at the election of the purchaser under § 97–114. Not all sales of unregistered securities, however, actually violate Georgia's law. Specifically, Dickson seeks shelter under § 97–107(c) of the Georgia Code, which provides an exemption for "An isolated transaction in which any securities are sold by or for the account of the owner of such securities . . . if such transaction is not one of repeated and successive transactions of a like character, and if such owner or his representative is not the issuer or underwriter of such securities." Dickson did own the stock he sold to Miss Whitaker and Mr.

---

1. No claim was brought under the federal registration requirements of the Securities Act of 1933, 15 U.S.C. § 77a et seq.

2. We note that as of this writing, but long after trial, Georgia has replaced the law

which forms the basis of this decision with the "Georgia Securities Act of 1973," Ga. Code Ann. § 97–101 et seq. All citations herein to the Georgia Code are to the sections as existing prior to the 1973 Act.

Vohs. Thus whether or not his sale qualifies for the Georgia "isolated transaction" exemption depends on whether it was "one of repeated and successive transactions of a like character" and whether Dickson was an "issuer" or "underwriter" of the stock. These are all terms of art for whose construction we turn to Georgia law.

A. *The sale was not "one of repeated and successive transactions of like character."*

After the judgment below, the Georgia Court of Appeals handed down a decision in the related case of Arnold v. Mixon, 127 Ga.App. 549, 194 S.E.2d 307 (1972), which has clarified the state's construction of the isolated-transaction exemption. That opinion jibes with, and indeed cites as authority, the district court's handling of the issue in our case. The facts of the two controversies are significantly similar. The *Arnold* case involved a sale of 1,500 MSA shares by Mixon to two fellow MSA employees, Arnold and Sharp. This sale had been negotiated with Mixon by Sharp, who then let his friend Arnold in on the deal. On April 25, 1969, Mixon transferred 1,000 MSA shares to Sharp. The closing with Arnold for the other 500 shares was delayed pending Arnold's arranging financing and occurred on May 6, 1969. Mixon's only other sale of MSA stock was 1,300 shares to Strategy, Inc. (John Whitaker's company), approximately two months following the Sharp-Arnold sale.

The Georgia Court of Appeals held:

The evidence shows conclusively that the separate transfer by sale by Mixon of 1,000 shares of MSA stock to Sharp on April 15, 1969 and of 500 of MSA stock to Arnold on May 26, 1969, were but results of one transaction in which a sale resulted to two people, the delay in the consummation of the sale to Arnold being occasioned by Arnold's delay in making financial arrangements to consummate the sale. *While there were successive sales,*

*there were no successive transactions.* [Citing the district court decision in the instant case.] (emphasis added) 194 S.E.2d at 308–309.

The court went on to hold that the sale by Mixon to Strategy, Inc., which fell within a separate exemption for sales to businesses engaged principally in buying securities, could not be said to be a successive transaction of a like character with the Arnold-Sharp sale.

■ Applying this analysis to the instant case, it is clear that Dickson's sale to Whitaker and Vohs must be viewed as a single transaction. As in Arnold v. Mixon, Dickson's sale was negotiated entirely by one of the purchasers, Miss Whitaker, with Vohs' interest being disclosed only after an agreement by Dickson to sell MSA stock to Miss Whitaker had been reached. While there were two purchasers, there was but a single negotiation and, unlike the transaction in Arnold v. Mixon, a single closing.

Appellants would have us view Dickson's efforts, before and after the sale, to help them contact other persons who might sell them MSA stock as repeated and successive transactions of like character with his May 7, 1969, sale to them. Whether or not Dickson's solicitations in aid of Miss Whitaker's desire to purchase stock from others could be treated as "transactions," we do not consider the conduct to be of "like character" with his own sale to plaintiffs. As found by the trial court, his efforts to aid appellants in locating stock and his own sale of stock were not successive acts in a single plan of stock distribution. The same must be said of Dickson's arrangement, at Miss Whitaker's request, for purchase of 500 shares of MSA stock by her mother from another MSA employee. All such conduct looks much more like a well-meant response to her persistent entreaties for help in finding available stock than any distributive plan on his part.

Dickson's only other sale of MSA stock was that of his remaining 1,000 shares to one Douglas Jackson approxi-

mately eight months after his sale to Whitaker and Vohs. We find this sale to be detached from the sale to plaintiffs. It not only occurred after a significant lapse of time but appears to have been motivated by entirely different factors—primarily a declining market value for the shares—from his sale to appellants.

## B. Dickson was not an "issuer" of the stock.

Georgia Code § 97–102(j) provides: "'Issuer' shall mean any person issuing any securities sold or offered for sale to any person in this State." Giving the words in this definition the usual significance attached to them in the trade, as Georgia Code § 102–102 requires, it seems that the issuer of the MSA shares purchased by appellants was not Dickson but MSA, which put the shares into circulation initially.

Appellants have argued that Georgia's definition of issuer is a meaningless tautology and press the court to apply the definition appearing in 15 U. S.C. § 77b(11).[3] This definition is statutory and peculiar to the federal securities law and regulatory plan. We see no occasion or warrant for reading it into the Georgia Code. Moreover, even if the 15 U.S.C. § 77b(11) definition of issuer were accepted by the court, we do not think Dickson would be an issuer. There is absolutely no indication that he was controlled by MSA regarding his stock sales or otherwise acting in concert with the company in respect to its securities.

## C. Dickson was not an "underwriter" of the MSA shares.

"Underwriter" was not defined by statute in Georgia prior to the comprehensive 1973 revision nor have Georgia courts construed the term. The Georgia Securities Act of 1973 defines underwriter along essentially federal lines (aside from an exception for securities held one year or more). This new definition must be viewed in the context of a code no longer employing an isolated transaction exemption. The old Act, which controls our case, was not in need of an expansive definition of underwriter to cover entirely an area which was already partially covered by other language in the isolated-transaction provision. Moreover, when the Georgia legislature enacted the forerunner of this provision in 1920, it is inconceivable that it could have intended to incorporate the novel definition of underwriter contained in the federal Securities Act of 1933. The fact that a definition is newly included in a revision modelled after the federal Act is persuasive that the usual, more limited, meaning of underwriter is applicable to the old Georgia Act.

The term "underwriter" reasonably refers to those investment institutions only which as a business assume the market risk of public stock offerings, most typically by purchasing all or a portion of an issuer's issue of stock at a fixed price and then reselling it to the public. This construction is consistent with the requirement of Georgia Code § 102–102 that words be given their usual

---

3. Title 15, § 77b(11) defines the term *underwriter* in the Federal Securities Act of 1933. It does provide in part, however, that "As used in this paragraph [defining "underwriter"] the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." This "control" clause was apparently added to deal with difficulties encountered with secondary public offerings because of the draft-

ers' deliberate rejection of the "isolated transaction" exemption usually contained in state securities acts. See Landis, The Legislative History of the Securities Act of 1933, 28 Geo.Wash.L.Rev. 29, 37–38 (1955).

The basic federal definition of *issuer*, which appears in 15 U.S.C. § 77b(4), is identical to Georgia's definition in her 1973 Act; and both are substantially the same as, and no more tautological than, the earlier Georgia definition which applies to our case.

significance in the trade, and by it Dickson was not an underwriter.

Even were we to yield to plaintiffs' entreaties to read the federal definition of underwriter into the Georgia Act, it would be of no avail to them. Under 15 U.S.C. § 77b(11), "The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security. . . . ." The word "distribution" as used in this definition is considered to be synonymous with "public offering." 1 Loss, Securities Regulation 551 (1961). Since Dickson sold for his own account, not for the issuer, he was an underwriter only if he purchased "with a view to" a public offering of MSA stock.

Whether or not Dickson purchased with a view to a public offering is a question of fact which the district court answered in the negative after considering all of the circumstances. Of course, there are some guidelines which assisted the court making its finding. *See* SEC Releases Nos. 33–4552 (November 6, 1962) and 5523 (January 11, 1972). The longer the period of retention by the owner before his sale, the more persuasive would be the argument that the resale is not at variance with an original non-distributive intent. An "investment letter," whereby the owner records his own assertion of what was in his mind when he took the securities, may be probative. An unforeseen change of circumstances since the date of purchase may be evidence that a distribution was not originally contemplated. The nature of the purchaser's past investment and trading practices and the character and scope of his business may be inconsist-

ent with his buying securities for resale to the public.[4]

Dickson was not in the securities business. When he purchased his MSA stock he was an MSA employee. It was only natural that he should want to buy stock in the company he worked for and hold it for investment. At the time he purchased the bulk of his stock (later split into 3,000 shares), ownership of MSA stock was tied to employment, and Dickson was required to offer the stock back to the company if he left its employ. His 1,000 additional shares of stock were acquired in smaller amounts through MSA's employee stock purchase program. If we assume that all of the stock sold to the plaintiffs was the original stock purchased by Dickson on December 8, 1967 (which appears to be the case), he held the stock for nearly one and a half years before selling to the plaintiffs on May 7, 1969. Moreover, upon purchasing shares ultimately comprising 3,500 of his total 4,000 shares, he executed letters declaring his intention to purchase solely for purposes of investment rather than distribution. Whatever the worth of such declarations standing alone, they are supported by the facts surrounding these purchases and sales. Dickson's sale of stock to Whitaker and Vohs was not solicited by him. Miss Whitaker, a fellow employee, approached Dickson about a possible sale and at first he refused. Only later did he change his mind and decide to sell 3,000 shares, retaining 1,000.

■ These and other circumstances amply support the lower court's finding that the defendant took the stock with an intent only to invest in the company for which he worked, but later changed his mind after repeated urgings by Miss

---

4. Because of its dissatisfaction with the uncertainty in evaluating these factors, the SEC has recently promulgated Rule 144 setting out specific conditions under which unregistered securities may be resold publicly without fear of violating federal law. However, with respect to securities such as Dickson's which were acquired prior to the

effective date of the new Rule, April 15, 1972, the SEC continues to consider "change in circumstances" along with other relevant factors in issuing "no action" letters. We, therefore, review the circumstances surrounding this transaction free of any shift in SEC viewpoint. See SEC Release No. 5223 (January 11, 1972).

Whitaker to enter into a sale that would result in a large profit for him. So understood, his view was not to a public offering.

D. *Dickson's sale to plaintiffs were not voidable as violative of Georgia's securities law.*

Plaintiffs submit one final argument for rescission pursuant to the Georgia Securities Act. They allege that the MSA stock which they purchased from defendant had been issued to defendant by MSA in a manner not conforming to Georgia's registration requirements. This unlawful issue, they maintain, "tainted" the stock and gave defendant a right of rescission which they, as assignees of the stock, now possess. We cannot accept this argument. Georgia Code § 97–114, effective at the time, provides that the purchaser of stock at an unlawful sale may void the sale if he chooses. Assuming MSA's stock issue to defendant was unlawful, he did not choose to rescind the transaction. There was absolutely no evidence that he had knowledge, either actual or constructive, that the securities were sold to him in an unlawful manner. He could by no stretch of the imagination be deemed MSA's agent in passing the stock on to plaintiffs. He chose to keep it, trusting that it was lawfully issued, until Miss Whitaker persuaded him to sell. In his hands it was "untainted" stock, and his purchasers had no ground to complain under Georgia law because of any irregularities that might have accompanied its issue.

## II.

### DEFENDANT'S SALE DID NOT VIOLATE FEDERAL SECURITIES LAW.

Plaintiffs contend that defendant violated the anti-fraud provisions of § 10(b) of the Securities Exchange Act of 1934[5] and Rule 10b–5 promulgated thereunder[6] when he sold MSA stock to them. These provisions make it unlawful for any person to fail to disclose a material fact or to misrepresent a material fact in connection with a sale of securities. Plaintiffs do not contend Dickson actually misrepresented any facts concerning MSA or MSA stock. They do make some assertions that he failed to disclose material facts which he actually knew. But they most seriously maintain that he failed to disclose material facts which in the exercise of due care he *could* have known. Specifically, the "facts" which plaintiffs contend were undisclosed are: (a) cancellation of the proposed public offering of MSA stock, (b) various financial data concerning MSA, and (c) the terms under which they were required to take and hold the securities.

In essence, Dickson responds that he did not know anything not known to plaintiffs, that he was in no position, and had no obligation, to know any more, and that plaintiffs did not reasonably rely on him in making their decision to purchase.

These defenses Dickson casts in terms of the standards set out in City National Bank v. Vanderboom, 422 F.2d 221 (8th Cir. 1970), and incorporated by this court in Clement A. Evans & Company v. McAlpine, 434 F.2d 100 (5th Cir. 1970):

> We think this two-step test breaks down as follows: (1) . . . With regard to nondisclosures, the issue becomes whether a reasonable investor, in light of the facts existing at the time of the nondisclosure and in the exercise of due care, would have been entitled to receive full disclosure from the party charged and would have acted differently had the alleged nondisclosure not occurred. (2) If the plaintiff satisfies this 'in connection with' step, it then becomes necessary to determine whether the defendant's

---

5. 15 U.S.C. § 78j.

6. 17 C.F.R. § 240.10b–5.

misrepresentation or nondisclosure was made with scienter or from a lack of due diligence.

434 F.2d at 103.

In other words, if we conclude that a material fact was not disclosed, the critical issues are those of the *reliance* of the plaintiffs and the *scienter* of the defendant. But these are terms of art which we hesitate to use without noting their peculiar meanings in the context of a securities fraud case.

■ In Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court stated that ". . . positive proof of reliance is not a prerequisite to recovery." However, as we explained in Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880 (5th Cir. 1973), this language must be confined to making proof of *specific* reliance on particular omissions unnecessary when the circumstances indicate that the plaintiff placed some *general* reliance upon the defendant's disclosing material information.

■ Concerning the requirement of scienter, we have very recently stated in Smallwood v. Pearl Brewing Company, 489 F.2d 579 (5th Cir. 1974), and again in Sargent v. Genesco, Inc., 492 F.2d 750 (5th ·Cir. 1974), that some culpability beyond mere negligence is required for liability under 10b–5. We approve the explanation of this concept furnished by the Second Circuit in Cohen v. Franchard Corporation, 478 F.2d 115 (2d Cir. 1973):

> We uniformly have held that a party cannot be held liable in a private suit for damages under Rule 10b–5 for mere negligent conduct. . . . Although it is unnecessary to prove the specific fraudulent intent essential to a claim of common law fraud, it must be established that the defendant was to some extent cognizant of the misstatement or omission. . . . The standard for determining liability under Rule 10b–5 essentially is whether plaintiff has established that defendant either knew the material facts

that were misstated or omitted and should have realized their significance, or failed or refused to ascertain and disclose such facts when they were readily available to him and he had reasonable grounds to believe that they existed. . . . It is not enough for plaintiff to show that defendant failed to detect certain material facts when he had no reason to suspect their existence.

478 F.2d at 123.

Applying the preceding expressions of law to the facts can prove quite difficult in a close case. But, upon scrutinizing each of the "facts" which plaintiffs contend were undisclosed, we find that this is not such a case.

### A. *The cancellation of the proposed public offering of MSA stock.*

■ A material fact is one which would cause a reasonable investor to have acted differently in respect to a securities transaction. Securities and Exchange Commission v. Texas Gulf Sulphur Company, 401 F.2d 833 (2d Cir. 1968). Oftentimes, cancellation of a proposed public issue might be material. In this case, however, plaintiff Whitaker knew months before she bought the MSA stock from defendant that the proposed public issue set for the spring of 1969 had been cancelled. Moreover, there is evidence that a public offering for fall of 1969 was still being considered by MSA and its underwriter at the time of defendant's sale. No evidence was presented that defendant, or anyone else for that matter, was in a position to suspect otherwise at that time. In this posture, no "fact" of cancellation existed which could have been disclosed by Dickson.

### B. *Various financial data concerning MSA.*

■ Plaintiffs contend that defendant knew, or had access to, information which revealed MSA's unfavorable financial situation and which he was obligated to disclose and/or interpret for

them prior to sale. Such information they allege, could have come from any of three sources: (1) his position as a "key" employee, (2) his relationship with Ronald LaChance, the secretary/treasurer, or (3) his access, as a shareholder, to MSA's books and records. We agree with the district court that none of these circumstances provided Dickson with material information which he should have known and disclosed to plaintiffs.

■ Whitaker and Vohs failed to show that Dickson's position with MSA, relative to their own, was such that he should have discovered facts which they were not in an equal position to discover or that he was cognizant of any omissions. True, he was Mr. Vohs' superior, just as Mr. Vohs was Miss Whitaker's superior. But this fact alone does not indicate that he had greater access to material information. Whether or not Dickson is labeled a "manager," as the trial judge was unwilling to do, the plaintiffs offered no evidence that his position slightly higher on the corporate ladder made "inside" information available to him. There is no indication that his designation as a "key" employee for purposes of allowing him to purchase limited amounts of company stock carried any access to special information with the title. We note that plaintiffs attached no significance to the fact that Mr. Fred Pattison, their co-venturer in attempting to locate any available MSA stock, was Dickson's superior or to the fact that Vohs was granted options to purchase company stock. In this light, it seems that Dickson had access to no more financial information, through his employment position, than did the co-venturers.

■ LaChance, as secretary/treasurer of the corporation, was the person most likely to be familiar with its financial condition. Plaintiffs advance two theories charging Dickson with LaChance's knowledge. The first we may term "liability by association":

that, since Dickson worked closely with LaChance on certain computer projects, this circumstance gives rise to the inference that Dickson had access to material inside information. The district court rejected this inference, and we are presented no facts which compel a finding to the contrary. Something more substantial than a working relationship with an "insider" is required to make another an "insider" under 10b–5.

■ Second, plaintiffs allege that LaChance in his conversations with them misrepresented and failed to disclose material facts. They contend that, in doing so, LaChance was acting as defendant's agent. We find more than ample justification for the district court's refusal to hold that such an agency existed. To have found otherwise, it would have had to hold that defendant's suggestion that Miss Whitaker talk to the officers of MSA most directly involved in the financial aspects of the business to obtain information that he did not possess was sufficient to make their actions his. Much more than this seemingly well-meant referral is necessary to create an agency relationship and consequent vicarious responsibility.

■ Plaintiffs, too, were charged with a duty of reasonable investigation. Clement A. Evans & Company v. McAlpine, 434 F.2d 100 (5th Cir. 1970). This obligation they appear to have satisfied. They repeatedly met with LaChance for the purpose of discussing MSA, its stock and financial condition. Miss Whitaker was in apparent continuous communication with her brother, who was in the securities business, concerning the advisability of the purchase. He reviewed with her the financial data contained in MSA's 1968 Annual Report, which Dickson had provided at her request after LaChance's refusal to do so.

■ The problem seems to have been that all of plaintiffs' investigation failed to disclose MSA's tenuous position. Now they complain that Dickson

did not analyze and explain to them the footnotes and other financial information in the 1968 Report—the significance of which John Whitaker, an expert, failed to perceive. We are no more inclined than was the district court to impose this obligation on the defendant. Moreover, it is plain that the plaintiffs did not attempt to place such a burden on him prior to this litigation. The record presents a picture of aggressive purchasers who took it upon themselves to ascertain the status of the company and its stock, not persons who passively relied on the knowledge and advice of their seller.

 The plaintiffs stress that defendant as an MSA shareholder of over six months standing at the time of the sale could, pursuant to Georgia Code § 22–613, have demanded to inspect MSA's books and records. This right the plaintiffs did not have at the time. However, this court refuses to hold that any duty of due care defendant owed plaintiffs extended so far as to require him, prior to the sale, to comb the corporate books for facts which might have affected plaintiffs' decision to buy MSA stock. In so holding, we are persuaded by the philosophy behind the federal security-fraud legislation. Approval of the plaintiffs' position would subject virtually every stockholder of a corporation to its penalties if the sale did not pan out for the purchaser. In short, an ordinary employee-stockholder is not chargeable with constructive knowledge of financial matters he might have discovered by an expert review of company books.

 Finally, plaintiffs ask, "Was this a runaway shop?" This broad question is left unanswered. They point to circumstances, revealed in depositions, which in some measure support such an inference: LaChance left MSA in the summer of 1969, and Dickson in the fall, to go to work for a new company apparently composed to some extent of previous employees of MSA. The answer to the more specific, relevant question, "Did Dickson *know* that this was a runaway shop at the time of the sale?" is necessarily subsumed within the district judge's express finding that he did not fail to disclose any material fact which he knew. Sheer speculation provides no basis for us to find the district judge in clear error and we decline to do so.

*C. The terms under which plaintiffs were required to take and hold the securities.*

Plaintiffs' arguments on this point are somewhat unclear. It is difficult to tell whether they complain of defendant's failure to advise them of the consequences of Georgia registration requirements or those of federal registration requirements. We assume that they are disturbed by his failure in both respects, but conclude that in neither did he act improperly.

The Georgia "6(j)" exemption, Georgia Code § 97–107(j), in effect at the time, exempted from registration sales of securities by or on behalf of an issuer to less than 25 persons, provided, *inter alia,* each purchaser filed an affidavit avowing an intention to purchase for investment and not resell for 12 months. Plaintiffs assert that MSA obtained a 6(j) exemption only for the transaction in which defendant acquired his first 3,000 shares. Whether or not these were the 3,000 shares transferred to plaintiffs, and whether or not they were aware of MSA's having obtained the 6(j) exemption for at least part of the stock which passed to them, are of absolutely no consequence.

 6(j) applies only to issuers and their agents. Each subsequent seller must find his own exemption from Georgia registration requirements. Under the then-existing Georgia Act, all non-exempt sales of securities had to be registered no matter who was the seller. It made no difference to the purchaser how the seller acquired his stock, for

none of the exemptions from registration depended on the seller's acquisition. As discussed in Part I, Dickson's sale to them was exempt as an "isolated transaction." Whitaker and Vohs would have to comply with Georgia law if they sold the stock in Georgia notwithstanding how they acquired it or how Dickson acquired it. No restrictions resulted from the 6(j) exemption, and none needed to be disclosed.

█ Dickson was not required to tell them that they had to take with non-distributive intent in order to qualify for an exemption in Georgia. In fact, such advice would have been a misstatement of Georgia law as it then existed. And he certainly was not required to have predicted the exemption for those not "underwriters," in the federal sense of the word, under § 97-109(c) of the Georgia Securities Act of 1973.

Plaintiffs also contend that defendant violated Rule 10b-5 when he failed to advise them that the stock—which had been issued to him in a transaction not registered under the Securities Act of 1933—must be purchased with non-distributive intent in order for them to escape federal registration requirements upon a subsequent resale.

At the threshold, we note that it is not at all clear that the stocks sold to plaintiffs actually had to be taken with non-distributive intent. Only for the sake of argument do we assume that this conclusion of law on the part of plaintiffs is correct.

Federal law makes it fraudulent to misrepresent or omit material *facts* in respect to a sale of securities. Here plaintiffs knew at the time of the sale that the stock involved had been issued in an unregistered transaction and again was not registered in passing to them. Before the sale plaintiff Whitaker, acting for Mr. Vohs as well as herself,

asked Dickson if an "investment" letter was necessary to purchase MSA stock lawfully. Dickson told her he did not know the answer to that question. Subsequently, but still before plaintiffs purchased the stock, Miss Whitaker sought and obtained from her own lawyer an opinion on whether her purchase of MSA stock issued in an unregistered transaction required an "investment" letter. His answer was no. Seemingly, plaintiffs' current position is that this opinion of law was incorrect to the extent it indicated that the MSA stock did not have to be purchased with non-distributive intent.[7]

█ The important point about the question in this case is that whether or not plaintiffs had to take the stock with non-distributive intent is not a mater of fact—material or otherwise; it is a matter of law. Rule 10b-5 cannot be construed to require a prospective seller of securities to give his prospective buyers legal advice on technical matters arising under the federal securities law. If the buyer is aware of the material facts—e. g., that the stock he is to buy was issued in an unregistered transaction—he should be as aware of the *legal consequences* of those facts as his seller. Here it is plain that plaintiffs knew as much as defendant about the facts relating to the legal need for taking with non-distributive intent.

Plaintiffs point out that the Securities and Exchange Commission, in Release No. 5223 (January 11, 1972), has ruled long after the sale in question that, in connection with a "private placement" of securities, the seller must inform his purchasers fully as to the circumstances under which they are required to take and hold the securities and the limitations upon their resale. Without passing upon the correctness of this ruling in another context, we do not

7. Dickson, too, obtained a letter from *his* lawyer—which did not deal with the question of the purchasers' necessary intent, but stated that he was not required to. file a registration statement with the SEC in conjunction with the transfer to them. Plaintiffs do not contest, and we do not consider, the correctness of that opinion.

read it as conflicting with our opinion herein. The SEC is justifiably concerned with the position of those who purchase unregistered stock at private offerings when they later desire to resell it. This, however, has not been shown to have been a "private offering" toward which that concern is directed. If it was a private offering the character of which had to be preserved in order to avoid subsequent registration, this legal conclusion was not grasped by the parties or their counsel—and it escapes us. Under such circumstances, Dickson was not required to risk legal advice which might well have been erroneous. A different conclusion might be called for where an issuer is himself seeking the benefits of a private offering, but neglects to advise his purchasers of the effect of his plans upon them. This is far from our situation.

## CONCLUSION

In summary we restate that Dickson's sale to plaintiffs was an "isolated transaction" exempt from Georgia registration requirements. As to the fraud claim, it simply was not proven; skeletal circumstances suspicious to plaintiffs are far from sufficient cause for us to hold that the district judge was clearly erroneous in his factfindings. And in his conclusions of law based thereon he was uniformly correct.

This appears to have been a very unfortunate situation in which Miss Whitaker and Mr. Vohs made every reasonable effort to ascertain in advance the wisdom of their rather sizeable investment—only to have their judgment proven wrong. If the collapse of MSA could have been forecast by anyone at the time, on which subject we will not hazard a guess, there was no showing that Mr. Dickson was in a position to do so. In this light, we cannot shift the consequences back to the one who got out at a very opportune time.

Affirmed.