**Milton E. DUPUY, Plaintiff-Appellant,**

v.

**Clarence O. DUPUY, Jr., Defendant-Appellee.**

No. 76–2667.

United States Court of Appeals, Fifth Circuit.

May 9, 1977.

Rehearing and Rehearing En Banc Denied June 6, 1977.

---

C. Ellis Henican, Jr., Andrew I. Brown, Carl W. Cleveland, New Orleans, La., for plaintiff-appellant.

Milton E. Brener, Arthur L. Ballin, James G. Dalferes, New Orleans, La., for defendant-appellee.

Before JONES, WISDOM and GODBOLD, Circuit Judges.

WISDOM, Circuit Judge:

In this brother-against-brother case, a purchaser of stock, to depress the price, misrepresented and failed to disclose material facts regarding the value of the stock. The question presented is whether the seller of the stock will be denied recovery against the purchaser under Securities and Exchange Commission Rule 10b–5[1] because the seller, who could have ferreted out the facts, failed to do so until after the sale.

The case turns on the degree of diligence required of the plaintiff, Milton Dupuy, under Rule 10b–5 when the defendant, his brother Clarence, intentionally committed acts of fraud that significantly affected the plaintiff's decision to sell the stock at a price considerably below its value. This is primarily a question for the jury to decide. Here, on interrogatories submitted to the jury, the jury decided that the plaintiff had "exercised due diligence for his protection in connection with [the] sale of the stock",[2] and awarded Milton damages of $905,000.

1. 17 C.F.R. 240.10b–5 (1976) states in part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, . . .
(1) to employ any device, scheme, or artifice to defraud,
(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The Rule is promulgated under section 10–b of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970):

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

2. This is language of the district court's fourth interrogatory. The court's question and the jury's answers included the following:
1. Do you find that in connection with, and prior to the sale of stock by Milton E. Dupuy to Clarence O. Dupuy, Jr., that the defendant, Clarence O. Dupuy, either knowingly or recklessly misrepresented or knowingly or recklessly failed to disclose any material fact(s) to the plaintiff, Milton E. Dupuy?
Answer "Yes" or "No"
Answer: Yes__X__ No_____
. . . . .
2. Did Milton E. Dupuy rely on the misrepresentations of the defendant or would he

The trial judge granted the defendant's motion for a judgment notwithstanding the verdict. He held that there was "no evidence from which a finder of fact might have inferred any diligence on the part of the plaintiff".[3] Alternatively, the trial judge stated that "if it were not for the Court's ability to make this finding in the fashion I have, I would feel compelled to grant a new trial, because I feel under all the circumstances of the case, the size of the verdict . . . shocks the Court's conscience and also [is] contrary to the weight [of the evidence]".[4]

We reverse the judgment n. o. v., but remand the case for a new trial on damages.[5]

## I.

### *The Facts*

Clarence and Milton Dupuy were raised in poverty in a poor section of New Orleans. They worked as children and as youths and always on a share and share alike basis. Until the dispute arose that generated this litigation the two brothers worked harmoniously for many years on real estate ventures. By 1971 they had accumulated certain valuable properties held by Les Freres Corporation, Argonne Corporation, Dupuy and Dupuy, a partnership, and Dupuy Construction Company, a partnership. The stock and the partnerships were divided equally between Clarence and Milton. Clarence was the older brother and dominated their personal relationships. He was an attorney, a successful politician, and an elected member of the New Orleans City Council. Milton did not finish college, but acquired firsthand knowledge of the construction business and real estate development. At one time he was appointed and served as President of the Orleans Parish Levee Board.

In late 1971 the Dupuys organized the Lori Corporation to acquire a valuable long-term lease on land bounded by Toulouse, Burgundy, Rampart, and St. Peter streets in the City of New Orleans. This property is within but on the edge of the French Quarter. The value of the land was enhanced when, prior to the Dupuys' acquisition of the lease, the City Council of New Orleans declared a moratorium on construction of hotels in the French Quarter, but excepted from the ban the premises just described.

To form Lori Corporation, each brother contributed $1,880 to the enterprise and received 47 percent of the company's stock.[6] Milton was president, Clarence Secretary-treasurer, and Mrs. Dupuy, their mother, vice-president. During 1971 and early 1972 Milton supervised the day-to-day develop-

---

have attached importance to the information withheld from him in connection with and prior to the sale of the stock?
    Answer: Yes__X__ No_____

4. Do you find that Milton E. Dupuy exercised "due diligence" for his protection in connection with this sale of stock?
    Answer: Yes__X__ No_____
5. On what date do you find Milton E. Dupuy discovered, or should have discovered, through the exercise of reasonable diligence, the misrepresentations or omissions referred to in Interrogatory No. 1?
Answer by checking one:
    Before September 7, 1972
    On or after September 7, 1972__X__

6. What amount do you feel will adequately compensate the plaintiff for the damages he has sustained?

Answer by means of a numerical figure.
    Answer: $__905,000__

3. Fed.R.Civ.P. 50(b).

4. Fed.R.Civ.P. 50(c). The court added:
    . . . I would grant a new trial rather than a remittur, because I feel that it would be unfair to both sides for the Court to substitute its own judgment.

5. This is the second appeal of this case. Shortly after the suit was filed, Clarence moved for summary judgment on the ground of lack of federal jurisdiction. The district court granted the motion. *Dupuy v. Dupuy*, E.D.La.1974, 375 F.Supp. 730. This Court reversed and remanded for trial, *Dupuy v. Dupuy*, 5 Cir. 1975, 511 F.2d 641.

6. Their mother, Mrs. Florence Dupuy, received the remaining six percent of the stock.

ment of this venture.[7] He signed the lease with the landowner, met frequently with the architect, August Perez, and assembled statistics for the necessary financing. He and Clarence met with the president of the Bank of New Orleans, Lawrence Merrigan, and a mortgage banker, J. H. Harris (representing Colwell Mortgage Trust) to discuss financing the project. As compensation for these duties and his management of other jointly held properties, Milton received a monthly fee of $1,150.

At Harris's suggestion, Milton obtained an appraisal from Mr. John D. Bird, in whom Colwell had confidence. Bird valued the project initially at $7,340,000 and the market value of the lease at $986,500,000. Because of changes in the plans, he reduced these figures respectively to $7,100,000 and $962,330,000.

All went well until March 30, 1972, when Clarence abruptly cut off Milton's management fee. Clarence had always controlled the checkbook. Clarence says that Milton turned his back on the project. At the time, however, Milton's monthly fees were his sole source of income; he had no substantial savings; Milton had serious kidney trouble causing increasing medical expenses; and he was supporting his present wife and child and his former wife and children. He could not borrow on his interest in the Les Freres and Argonne corporations, because he had no means of paying the debt. Milton asked Clarence to buy his interest, but Clarence offered him only a note. Milton's financial crisis forced him to find other employment. He obtained a job with Norman Brothers, real estate developers, but the work required travel to Clearwater, Florida, and to Algiers (across the Mississippi River from New Orleans). After three months, his health was so bad that he had to give up this job. He had worked for Norman Brothers from May 15 to August 18, 1972.

After his management was terminated and having no personal contacts with the development of the Lori property, Milton had to rely on Clarence for information as to what was happening to the financing of the projected hotel. Milton testified that whenever he spoke to Clarence over the telephone Clarence told him that the Lori Hotel "was having a rough time . . . everything is going downhill"; that "it's just practically worthless".

Shortly after Clarence cut off Milton's income, Clarence began negotiations with William Monteleone, owner of a well-known and long-successful French Quarter hotel. Earlier, Clarence and Milton had discussed but had never pursued the possibility of interesting Monteleone in the venture. Milton testified that Monteleone's name came up just once and then as a possible purchaser of some of Milton's stock. The banks and mortgage brokers had conditioned financing of the construction of the Dupuy hotel on the participation of someone having larger financial resources than Clarence and Milton possessed.

Clarence's negotiations with Monteleone and his representatives were extensive. A letter to the New Monteleone Hotel from Arthur L. Ballin, an attorney who represented Monteleone, shows that instead of "everything going downhill", prospects were favorable. As early as April 21, Ballin had a four-hour conference with Monteleone and Clarence to review the "proposition of joint venture and partnership in commendum".[8] On April 24 there was a two-hour conference by Ballin and Clarence to prepare a draft of the partnership. At that time, Monteleone was prepared to put up the necessary financing. On April 28 there was a two-hour conference by Ballin with Clarence and Monteleone, who expressed doubts about the joint venture. These doubts were later dissipated. Ballin

---

7. The brothers managed Lori as they had managed several other properties owned jointly, including apartments and a parking lot. Milton supervised the development of the projects and managed them after construction. Clarence provided legal services and financing.

8. The events referred to in this paragraph are taken from a letter by Arthur J. Ballin to the New Hotel Monteleone, Inc., dated July 6, 1972. (App. 47)

talked with Clarence on May 1 and arranged for a meeting the next day. May 2 Ballin met with Clarence. They were in agreement as to the partnership, but Clarence wanted and obtained an option to repurchase Monteleone's interest. May 5 Ballin had several telephone conferences and a meeting with Clarence. On May 8 Ballin again met with Monteleone and Clarence. On that day Monteleone instructed Ballin to prepare papers to complete the transaction. There followed meetings by Ballin with Clarence on May 12, to discuss provisions of the partnership agreement; on May 13, to re-draft the partnership agreement; on May 15, with Monteleone as well as Clarence, to revise the agreement; on May 17, a meeting with Clarence, after Ballin had studied the tax effects of the agreement; on May 19, a long telephone conversation to discuss the tax effects; on May 22, a meeting by Ballin with Clarence and accountants to discuss tax effects of the partnership. June 2 Ballin met with Clarence to review the revised agreement. June 6 Ballin met for three hours with Clarence and accountants to review the revised partnership agreement and tax questions. Finally, on June 7, 1972, Ballin met with Clarence and reviewed the final form of the partnership and Clarence's option. The partnership agreement called for Monteleone to put up, individually, $180,000 in cash, for which he would receive a 6 percent interest, and the New Hotel Monteleone, Inc., to put up $420,000 in cash for a 14 percent interest. The Lori Corporation would receive a 40 percent interest, for its lease to the land on which the hotel was to be built. Clarence would receive a 40 percent interest. Thus, for two months before Clarence bought Milton's stock and for one month before the putative directors' meeting approving the partnership with Monteleone, Clarence knew that the Lori stock was worth a small fortune, but not Milton, although he lived in the same apartment complex with Clarence and they shared a patio.

The partnership agreement was executed on July 31, 1972, before Arthur L. Ballin, in his capacity as Notary Public. Clarence Dupuy appeared individually and as Secretary-Treasurer of Lori Corporation. William A. Monteleone appeared individually. The New Hotel Monteleone appeared through its duly authorized Executive President.

On that same day, July 31, 1972, Clarence signed a certificate as Secretary of Lori Corporation certifying as true and correct a resolution, adopted by the Board of Directors of the Corporation, authorizing Clarence to execute on behalf of Lori Corporation the partnership with Clarence Dupuy, William A. Monteleone, and New Hotel Monteleone, under the name of "Lori Corporation and Associate". The contribution of the corporation was to be the assignment of the Lori lease to the partnership. Also, on that same day Clarence certified as true and correct a resolution authorizing an option in favor of Clarence and Lori Corporation, for five years, to repurchase the interests of William A. Monteleone and the New Hotel Monteleone for $700,000.

On cross-examination, Clarence admitted that he had not notified Milton of any meeting of the Board of Directors and that no meeting had been held. Indeed, so he said, no meetings of the Board had ever been held for the Lori Corporation or for any other of their corporations. This loose practice might be understandable when the two brothers had harmonious relations. But a jury would find it hard to understand why it did not put Clarence under the unshakable duty to disclose the facts to Milton, when the effect of the meeting that did not exist was to make effective the partnership with Monteleone resulting in the successful financing of the hotel and the assignment of Lori's sole asset to the partnership.

Because of Monteleone's participation, the partnership received a construction loan of $5,000,000 from Colwell Mortgage Trust. Clarence accepted Colwell's offer on July 25, subject to certain changes. Colwell approved the changes on July 27.

Clarence revealed none of these facts to Milton. Indeed, during the time he was negotiating with Ballin and Monteleone he assured Milton that the development of the

hotel had been stalled by a failure to obtain financing. Not knowing of Clarence's bright future for the hotel, never having been informed of the need for a bona fide or non-existent directors' meeting, and hard pressed financially, Milton urged Clarence to buy his stock.

Milton, more and more apprehensive about his investment, wrote letters to Clarence June 19, June 25, and July 9, 1972.[9] These letters clearly show that Milton mistrusted his brother. By that time, however, Clarence had closed his agreement with Monteleone, except for executing final papers. He gave no inkling of this to Milton.

In early June 1972 Clarence sent Milton a statement from G. E. Conroy, their accountant, for $375, and asked him to co-sign a check of Lori Corporation for that amount, payable to Conroy. The statement did not show the nature of the services performed. The record shows that they were to consider the tax aspects of Clarence's proposed transactions with Monteleone. Milton asked for a full report on what Conroy had done to earn the $375. Clarence did not reply to this request. The jury could have inferred that a reply would have disclosed to Milton his negotiations with Monteleone.

In August, still thinking that the hotel venture was in deep trouble, Milton agreed to sell his 47 percent interest in Lori for $10,000. On August 29 Milton signed the agreement of sale. He did so without consulting the bankers, the architect, or any lawyers. He explains that he relied on Clarence's representations because, in spite of his mistrust, Clarence was his brother on whom, in spite of everything, he had always relied. Moreover, the disease prevented an independent investigation. His kidney disease, diagnosed in 1965 as incurable glomeruler nephritis, had worsened considerably by 1972. It had forced Milton to quit his job on August 18, at which time, he said, he was flat on his back. The Social Security office set the date of his complete employment disability as April 1972.

Milton argues that the true value of his 47 percent interest in Lori was at least $500,000 and perhaps $1,200,000. On January 28, 1972, Clarence had estimated the value of his 47 percent at $493,250.00. A preconstruction appraisal valued the lease alone at $1,000,000. In February 1972 the equity value of the proposed hotel was estimated at $1,810,000. And the Monteleone transaction appears to have been based on a total value of $3,000,000.

Clarence tells a different story. As noted, he contends that the termination of Milton's income resulted from Milton's voluntary withdrawal from the hotel venture. Discussions with the Bank of New Orleans and the mortgage broker had revealed that both brothers would have to sign the note for the construction loan. According to Clarence, Milton did not want to risk his entire fortune on the hotel; he was insis-

---

9. After writing letters of June 11 and June 25, Milton sent the third on July 9, a letter that demonstrates that as of that date Milton had no agreement to sell his stock to Clarence:

Clarence,
I have had plenty of time to review your past actions and it is quite clear and can be proven that you have systematically stolen from me. In addition, you are now trying to steal something that is rightfully mine, my share of all the property.
You have lied and tried to con me about offering to buy my share of the Lori Corporation. . . .
I do not want to be part of any business venture or partnership or corporation arrangement whereby you may have an interest. I want my share of ALL the properties in the partnership and in the corporations and I want my share promptly. . . .

I want only my share that belongs to me and I want it now. And unless I get it I will have the lawyers to work you over good and properly and they will be paid well to do this.
. . .
Any offer that you may want to submit you must do so in writing only. . . .
The letter of June 25 states, in part: "You deliberately wanted me out of the corporation and this is the reason you abruptly cut off my income from our partnership and forced me to seek employment elsewhere on a full time basis." Clarence testified that he construed this language as consistent with his having entered into an agreement with Milton on June 22 by which he purchased Milton's stock. A jury could reasonably have reached the opposite conclusion.

tent that Clarence buy his interest in the project.

Clarence asserts that during the financial meetings with Merrigan and Harris, Milton discussed with them the prospect of a partnership with Monteleone.[10] The topic also arose in a meeting with the architect, Perez, according to both Clarence and Perez. The mother of the men testified that Milton told her in June that Monteleone was to be Clarence's partner. During this conversation, Milton reportedly reaffirmed his desire to sell his interest in the hotel. Clarence testified that not only had Milton reason to believe in the prospect of the Monteleone partnership, but he knew of its actual formation.

The brothers have different versions of the terms of the sale of the Lori stock. According to Clarence, Milton first suggested the sale and frequently pressured him through their mother for a speedy agreement on the terms. Clarence denies any direct contact with Milton except for a June meeting at which they agreed on a price of $45,000, $10,000 to be paid by check and $35,000 to be paid in cash; Clarence was to assume the corporation's note of $85,000 for interim financing. The payment on August 29, 1972, was witnessed by Milton's wife and mother. The mother testified that Clarence carried the cash to Milton's apartment in a large cardboard box. Milton denies both the June meeting and the payment of any cash, a denial corroborated by his wife.

Even though Clarence says that he paid $45,000 for Milton's interest in Lori, he insists that the stock was absolutely worthless at the time and that Milton could not have suffered any damages from the sale. Disregarding the successful financing, he argues that in August Lori owned only a lease that required annual rent payments of $50,000. There was no hotel, no income. Even if the hotel were built, substantial business risks precluded any guarantee of success. And the inherent lack of marketability of close corporation stock detracted further from the value of Milton's investment. Considering that Milton had contributed only $1,880 to the venture in 1971, Clarence argues that $45,000 was more than an adequate return in 1972. Clarence's return consisted of the value of 94 percent of Lori stock plus a 40 percent interest in the partnership.

Summarizing, Clarence bought Milton's 47 percent stock interest on August 29, 1972. A month before, July 31, Monteleone had paid $600,000 for a 20 percent interest in the partnership. By August 29 a $5,000,000 construction loan had been obtained. Two months before, on June 31, Clarence

---

10. Clarence overstates the supportive value of the testimony of Merrigan, Perez, and Harris.

Merrigan said that to say whether Milton was present at the meeting where Monteleone's name came up, he would have to rely on his memory, which he could not do. (Tr. XVII, 23) In fact, he could say only that he felt he may have met with Milton in January or February 1972. (Tr. XVII, 23). Merrigan testified that his appointment book listed only Clarence as having had an appointment on March 27, 1972; that Monteleone's name came up only as a hypothetical possibility. (Tr. XVII, 26).

Perez's testimony is inconsistent with Clarence's basic contention that Milton's salary was cut off because Milton turned his back on the project. Perez testified to a meeting with Clarence and Milton on March 28, 1972, (Tr. XVIII, 6) and it was his recollection that both Clarence and Milton had attended. According to Perez, both Clarence and Milton said on this date that the two brothers were considering the possibility of bringing Monteleone into the ho-

tel project, (Tr. XVIII, 8) and both of them would guarantee Perez's fees (Tr. XVIII, 8). Milton and Clarence told him to keep working. Clearly, Milton was not disheartened about the project at this March 28, 1972 meeting (Tr. XVIII, 19), two days before Milton's monthly fee terminated. About a month later, Clarence told Perez Milton was out of the deal. He did not see Milton after March 28, 1972.

Harris did testify that Monteleone's name had come up in a meeting attended by Milton on March 30, 1972. That was the date on which Milton's management fee was terminated. According to Harris, there was no evidence that Milton was withdrawing from the project. The first he heard of that was when Clarence told him so on May 22, 1972. (First Supp. Record, 145) In other words, Harris says Monteleone's name was mentioned on March 30 as a potential partner for both Milton and Clarence, not for Clarence alone. (First Supp. Record, 126)

certified a resolution, on its face adopted by the Board of Directors approving the partnership and assignment of Lori's lease. At that time there could be no doubt that Milton's stock was enormously valuable.

■ Clarence is here represented by Ballin. Ballin, here arguing that on August 29 Milton's 47 percent stock interest was virtually worthless, embraced a transaction in June and July requiring Monteleone to put up $600,000 for a 20 percent interest in Lori Corporation and Associate. The same transaction gave Lori Corporation a 40 percent interest. Clarence received a 40 percent interest and, of course, had a 94 percent interest in Lori after buying out Milton. On the record before it, the jury could fairly infer that Clarence intentionally misrepresented to Milton the financial prospect for the Maison Dupuy Hotel and that he concealed material facts from his brother to depress the price of the stock.

The more difficult question is the extent to which fraud under Rule 10–b is vitiated by the victim's lack of diligence in protecting his interests.

## II.

## DUE DILIGENCE

### A. *Judgment Notwithstanding the Verdict.*

The trial judge overturned the jury verdict because he found that the record showed no evidence that Milton had exercised due diligence to protect his own interests.

This Court, in *Boeing Co. v. Shipman*, 5 Cir. 1969, 411 F.2d 365 (en banc), limited our inquiry in this type of case to the question whether the district court improperly substituted its judgment for that of the jury:

> [T]he Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the

light and with all reasonable inferences most favorable to the party opposed to the motion. . . . [I]f there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. . . . There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–75. We need not resolve the swearing match. We need decide only whether a reasonable jury could have found from the evidence that Milton exercised due diligence under Section 10b–5, in the circumstances of this case, to protect his interests before he sold his stock to Clarence.

### B. *The Law of Due Diligence.*

#### 1. *Background and Approach*

The Securities and Exchange Act of 1934 did not provide expressly for a private cause of action to enforce Section 10–(b). Neither the Act nor its legislative history supply the elements of such an action.[11] When the SEC promulgated Rule 10b–5, apparently it intended to exercise its broad enforcement powers, rather than to establish a mechanism for investor compensation.[12] Consequently, the Commission also failed to announce the prerequisites for recovery of damages by victims of stock fraud. Not until *J. I. Case Co. v. Borak*, 1964, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, did the Supreme Court recognize a private cause of action arising from the Acts. The burden has fallen upon the courts to define the requirements for private enforcement of the securities laws.

---

11. *See* Wheeler, *Plaintiff's Duty of Due Care Under Rule 10b–5; An Implied Defense to an Implied Remedy*, 70 Nw.U.L.Rev. 561, 564–68 (1976); Comment, *Reliance Under Rule 10b–5:*

*Is the Reasonable Investor "Reasonable"?* 72 Colum.L.Rev. 562, 563 (1972).

12. *Id.*

The courts have established that with regard to private recovery for the violation of Rule 10b–5, a properly stated cause of action must establish the scienter of the defendant,[13] the materiality of any misrepresentation or omission by the defendant,[14] the extent of actual reliance by the plaintiff on the defendant's statements,[15] and the justifiability of the reliance, frequently translated into a requirement of due diligence by the plaintiff.[16] Treatment of the last of these elements has varied substantially among the circuits. This Court established "due diligence" as a separate element in 10b–5 cases, apart from questions of materiality, reliance, or defendants' duties. *Clement A. Evans & Co. v. McAlpine*, 5 Cir. 1970, 434 F.2d 100, *cert. denied*, 1971, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153, *rehearing denied*, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120; *accord Bird v. Ferry*, 5 Cir. 1974, 497 F.2d 112, *rehearing denied*, 5 Cir., 503 F.2d 567; *Vohs v. Dickson*, 5 Cir. 1974, 495 F.2d 607.[17] By considering independently whether the carelessness of a plaintiff

should preclude his recovery, the Court promotes two policies. First, general principles of equity suggest that only those who have pursued their own interests with care and good faith should qualify for the judicially created private 10b–5 remedies. *See Clement A. Evans & Co. v. McAlpine*, 5 Cir. 1970, 434 F.2d 100, 104; *City National Bank v. Vanderboom*, 8 Cir. 1970, 422 F.2d 221, 230 n.10, *cert. denied*, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560; Wheeler, *Plaintiff's Duty of Due Care Under Rule 10b–5: An Implied Defense to an Implied Remedy*, 70 Nw.U.L.Rev. 561, 564–68 (1976) (hereinafter cited Wheeler). Second, by requiring plaintiffs to invest carefully, the Court promotes the anti-fraud policies of the Acts and engenders stability in the markets. Wheeler, 70 Nw.U.L.Rev. at 585; Note, *The Due Diligence Requirement for Plaintiffs Under Rule 10b–5*, 1975 Duke L.J. 753, 760–61.

Some other circuits have used different approaches in evaluating the conduct of plaintiffs. Several courts have made the duty of defendants to disclose depend on the sophistication, status, and information

---

**13.** *Ernst & Ernst v. Hochfelder*, 1976, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668.

**14.** *Schlick v. Penn-Dixie Cement Corp.*, 2 Cir. 1974, 507 F.2d 374, *cert. denied*, 1975, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467; *Arber v. Essex Wire Corp.*, 6 Cir. 1974, 490 F.2d 414, *cert. denied*, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56; *Rogen v. Ilikon Corp.*, 1 Cir. 1966, 361 F.2d 260, 266.

**15.** *Holdsworth v. Strong*, 10 Cir. 1976, 545 F.2d 687; *Titan Group, Inc. v. Faggen*, 2 Cir. 1975, 513 F.2d 234; *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59; *Rochez Bros. v. Rhoades*, 3 Cir. 1974, 491 F.2d 402. The Supreme Court has held that proof of actual reliance is not required when defendants have omitted information rather than misrepresenting it. *Affiliated Ute Citizens v. United States*, 1972, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741. Reliance on the omission generally is presumed if the omission is material. *See, e. g., Competitive Associates v. Laventhal, Krekstein, Horwath & Horwath*, 2 Cir. 1975, 516 F.2d 811.

**16.** *Holdsworth v. Strong*, 10 Cir. 1976, 545 F.2d 687; *Straub v. Vaisman & Co.*, 3 Cir. 1976, 540 F.2d 591; *Vohs v. Dickson*, 5 Cir. 1974, 495 F.2d 607; *Rochez Bros. v. Rhoades*, 3 Cir. 1974, 491 F.2d 402; *Clement A. Evans & Co. v. McAl-*

pine, 5 Cir. 1970, 434 F.2d 100, *cert. denied*, 1971, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153, *rehearing denied*, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120.

**17.** *But see Stier v. Smith*, 5 Cir. 1973, 473 F.2d 1205, which did not examine the diligence of a plaintiff who had been induced to purchase stock from a corporate insider. The Court said:

> We should always be wary of holding that a purchaser of securities, who deals with the corporate insider, could have found out omitted material facts, by examining the corporate books or undertaking other extensive investigations. To do so is to allow the insider to present prospective purchasers with a mountain of information which they cannot possibly digest and excuse themselves from liability on the basis that they did not provide the right answers because they were not asked the right questions. *Id.* at 1208.

Rather than concluding that the plaintiff had fulfilled the limited requirements of due care imposed on an outsider, *see Bird v. Ferry*, 5 Cir. 1974, 497 F.2d 112, the Court merely held that Stier "was entitled to judgment as a matter of law because sophisticated investors, like all others, are entitled to the truth". 473 F.2d at 1207.

of the plaintiff. *White v. Abrams,* 9 Cir. 1974, 495 F.2d 724; *Arber v. Essex Wire Corp.,* 6 Cir. 1974, 490 F.2d 414, *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56; *Kohler v. Kohler,* 7 Cir. 1963, 319 F.2d 634. The First and Tenth Circuits have analyzed the facts to determine whether reliance by plaintiffs on misrepresentations was reasonable or justifiable. *Holdsworth v. Strong,* 10 Cir. 1976, 545 F.2d 687; *Rogen v. Ilikon Corp.,* 1 Cir. 1966, 361 F.2d 260. One panel in the Second Circuit has abandoned altogether the requirements of reliance in fact and justifiable reliance in cases involving intentional misrepresentations. In *Metro-Goldwyn-Mayer, Inc. v. Ross,* 2 Cir. 1975, 509 F.2d 930, the court held that the duty of the defendant to correct his misrepresentation is absolute, regardless of the defendant's knowledge of the misrepresentation. *Accord, Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath,* 2 Cir. 1975, 516 F.2d 811. *But see Titan Group, Inc. v. Faggen,* 2 Cir. 1975, 513 F.2d 234, *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59. *See generally,* Comment, *Securities Regulation—Two Different Standards of Reliance Applied in Individual Private Damage Actions Under SEC Rule 10b–5 by the Second Circuit,* 49 Temple L.Rev. 182 (1975).

These alternative approaches to the due diligence determination present several analytical problems, which cause us to retain the methodology of *McAlpine.*

First, inconsistent standards of conduct for defendants arise from analyses that vary the duty to disclose with the status of the plaintiff. Because the private 10b–5 cause of action derives from a prohibitory SEC rule, the standard of conduct for defendants logically should be the same whether the SEC or a private litigant enforces the duty. In an SEC enforcement proceeding, the due care of the victim generally does not receive consideration. *SEC v. Dolnick,* 7 Cir. 1974, 501 F.2d 1279, 1283 (disregarding whether the victim was a knowledgable investor); *Hanly v. SEC,* 2 Cir. 1967, 415 F.2d 589, 596 (disregarding the sophistication of the victims, as well as their previous relationships with the defendants). *But see SEC v. Coffey,* 6 Cir. 1974, 493 F.2d 1304, 1312–13, *cert. denied,* 1975, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (on the peculiar facts of this case the defendant violated no duty because the victims possessed sufficient knowledge about a representation to avoid being misled by it). The dispositive element in these cases is that the defendant owes a duty of full and fair disclosure to the public, not to any particular investor. Whether a private plaintiff might be precluded from recovery, then, need not alter the distinct consideration whether a defendant has violated duties imposed by the Act. With a flexible duty approach, however, the defendant owes different duties depending on the status of the victim and the type of legal action. This could lead both to unnecessary confusion between public and private enforcement proceedings and to gamesmanship by defendants. *See* Wheeler, 70 Nw. U.L.Rev. at 591.

Second, the materiality-reliance approach of the First and Tenth Circuits also faces a problem of consistency of application. In *Affiliated Ute Citizens v. United States,* 1972, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741, *rehearing denied,* 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 and 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345, the Supreme Court held that in a 10b 5 case involving a material omission "positive proof of reliance is not a prerequisite to recovery". *Id.* 406 U.S. at 153, 92 S.Ct. at 1472. By eliminating positive proof of reliance when materiality is established, the Court relieved the plaintiffs from an almost impossible burden of proof. *See Holdsworth v. Strong,* 10 Cir. 1976, 545 F.2d 687, 695; *Jackson v. Oppenheim,* S.D.N.Y.1974, 411 F.Supp. 659. *Ute Citizens* creates a distinction between affirmative misrepresentation cases, in which plaintiffs must demonstrate reliance on the assertions of defendants, and omission cases, in which such proof is not required. When due care is discussed in terms of reliance, then, the misrepresentation-omission distinction could remove from plaintiffs the responsibility of exercising due

care to protect their interests in omission cases. If reliance never becomes an issue, in other words, a court will have no basis to assess the justifiability of that reliance.

The purposes of examining the diligence of a 10b–5 plaintiff, however, do not justify distinguishing between misrepresentations and omissions. As we have suggested, courts have used due diligence to limit, as a matter of equitable discretion, recoveries to those parties who have purchased securities with care and good faith. Courts have also viewed the due diligence requirement as a method to promote statutory policies encouraging investor diligence in the interest of the efficiency and stability of the securities markets. These purposes for the due diligence requirement, whatever its form, do not vanish in omissions cases. As diligence can reveal misrepresentations, it can also reveal omissions. After *Ute Citizens,* then, tying the diligence analysis to reliance can generate an improper distinction between the misrepresentation and omission causes of action.

Third, to abandon completely the consideration of reliance in fact and reasonable reliance ignores not only the above policies of due diligence but also the need for a causal link between the misrepresentation or omission and the injury suffered by the private plaintiff. The cause of action would no longer provide compensation for losses occasioned by the violation of the Act because a plaintiff could sue without relying on the fraud. This would transform the action into an enforcement mechanism. We reject this approach because of the Su-

preme Court's recognition of a 10b–5 private action as a device to compensate victims of stock fraud and thereby to promote the public objectives of the Act. *J. I. Case Co. v. Borak,* 377 U.S. at 432–35, 84 S.Ct. 1555.

As we see it, the *McAlpine* approach of treating due diligence as a separate element in private 10b–5 cases best supports the policies of the Acts and ensures proper exercise of the Court's equity powers.

### 2. *The Subjective Elements of the Due Diligence Consideration.*

■ The diligence of the plaintiff in 10b–5 cases is judged subjectively. *Straub v. Vaisman & Co.,* 3 Cir. 1976, 540 F.2d 591, 598; *Clement A. Evans & Co. v. McAlpine,* 5 Cir. 1970, 434 F.2d 100, 102. The role model for a plaintiff, then, is an investor with the attributes of the plaintiff, rather than the average investor. For example, *McAlpine* approved a jury instruction that imposed a duty of due diligence "solely under the peculiar circumstances of each case, including existence of a fiduciary relationship,[18] concealment of the fraud,[19] opportunity to detect it,[20] position in the industry,[21] sophistication and expertise in the financial community,[22] and knowledge of related proceedings" (footnotes added). Several courts have also considered whether the plaintiff initiated the stock transaction or pressured for a speedy resolution. *White v. Abrams,* 9 Cir. 1974, 495 F.2d 724; *Hafner v. Forest Laboratories, Inc.,* 2 Cir. 1965, 345 F.2d 167; *Kohler v. Kohler Co.,* 7 Cir. 1963, 319 F.2d 634.

**18.** *Accord, e. g., Holdsworth v. Strong,* 10 Cir. 1976, 545 F.2d 687; *Straub v. Vaisman & Co.,* 3 Cir. 1976, 540 F.2d 591; *Bird v. Ferry,* 5 Cir. 1974, 497 F.2d 112; *rehearing denied,* 503 F.2d 567; *Rogen v. Ilikon Corp.,* 1 Cir. 1966, 361 F.2d 260.

**19.** *Accord, e. g., Myzel v. Fields,* 8 Cir. 1967, 386 F.2d 718, *cert. denied,* 1968, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143.

**20.** Most courts analyze whether the plaintiff has effective access to information about the fraud. *E. g., Holdsworth v. Strong,* 10 Cir. 1976, 545 F.2d 687; *Straub v. Vaisman & Co.,* 3 Cir. 1976, 540 F.2d 591; *Rochez Bros. v.*

*Rhoades,* 3 Cir. 1974, 491 F.2d 402; *Kohler v. Kohler Co.,* 7 Cir. 1963, 319 F.2d 634.

**21.** Most courts give weight to the plaintiff's being a corporate insider. *E. g., Holdsworth v. Strong,* 10 Cir. 1976, 545 F.2d 687; *Bird v. Ferry,* 5 Cir. 1974, 497 F.2d 112; *Myzel v. Fields,* 8 Cir. 1967, 386 F.2d 718.

**22.** *Accord, e. g., Holdsworth v. Strong,* 10 Cir. 1976, 545 F.2d 687; *Straub v. Vaisman & Co.,* 3 Cir. 1976, 540 F.2d 591; *Myzel v. Fields,* 8 Cir. 1967, 386 F.2d 718; *Rogen v. Ilikon Corp.,* 1 Cir. 1966, 361 F.2d 260.

### 3. The Standard of Care.

This Court has announced a due diligence test that measures the plaintiff's conduct against that of a reasonable investor with the attributes of the plaintiff. It is, in effect, a negligence standard. *Clement A. Evans & Co. v. McAlpine,* 5 Cir. 1970, 434 F.2d 100, 103, quoted with approval the test employed by the Eighth Circuit:

> With regard to misrepresentations, the question is whether a reasonable investor, in light of the facts existing at the time of the misrepresentation and in the exercise of due care, would have been entitled to rely upon the misrepresentation. . .

*McAlpine* answered that question in the negative and affirmed a jury finding that the plaintiff lacked "reasonable diligence". *Accord, Bird v. Ferry,* 5 Cir. 1974, 497 F.2d 112; *Vohs v. Dickson,* 5 Cir. 1974, 495 F.2d 607.

Recently, however, an important reexamination has begun of the appropriateness of applying a negligence standard to the conduct of plaintiffs when the Supreme Court has forbidden a similar standard to be applied to the conduct of defendants. In *Ernst & Ernst v. Hochfelder,* 1976, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, the Court reversed an imposition of 10b–5 liability without proof of scienter—"intent to deceive, manipulate, or defraud". *Id.* at 193, 96 S.Ct. at 1381. Ernst & Ernst, an accounting firm, had not intentionally defrauded the plaintiffs. The firm had contracted to audit a brokerage house, the president of which had perpetrated an intentional fraud. During the audit Ernst & Ernst failed to test adequately the internal control system of the company and thereby breached a common law and statutory duty to do so. Nevertheless, the Court refused to impose 10b–5 liability on the accountants because they had not acted with scienter, which the text of the opinion equated with intent. A footnote qualified the Court's holding:

> In this opinion the term "scienter" refers to a mental state embracing intent to deceive, manipulate or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for the purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b 5.

*Id.* at 194 n. 12, 96 S.Ct. at 1381.[23]

Two circuits have reevaluated their due diligence standards in light of *Ernst.* In *Holdsworth v. Strong,* 10 Cir. 1976, 545 F.2d 687, the plaintiff, Holdsworth, sold his stock in a close corporation to Strong. Although Holdsworth was a sophisticated insider with access to company books, he relied on several intentional misrepresentations by Strong about the financial health of the company. Citing *McAlpine* and *Rochez Bros. v. Rhoades,* 3 Cir. 1974, 491 F.2d 402, the court recognized that the traditional due diligence requirement imposed a standard of negligence on plaintiffs. But it decided that *Ernst* called for a change:

> If the negligence standard were being applied it might be appropriate to allow due diligence to be exacted from the victim, but where liability of the defendant requires proof of intentional misconduct, the exaction of a due diligence standard from the plaintiff becomes irrational and unrelated.

545 F.2d at 692. Consequently, the Court held that contributory fault would bar recovery only when plaintiff exhibited "gross conduct somewhat comparable to that of defendant". *Id.* at 693.

In *Straub v. Vaisman & Co.,* 3 Cir. 1976, 540 F.2d 591, the Court responded to *Ernst* by reversing the burden of proof on the due diligence issue. The plaintiff, the European manager of a portfolio management company, executed an unsuccessful stock purchase on the defendant's advice. In assessing the manager's diligence, the Court noted sever-

---

**23.** At least one commentator has argued after *Ernst* that the scienter standard should and will include recklessness. Bucklo, *The Supreme* *Court Attempts to Define Scienter Under Rule 10b 5: Ernst & Ernst v. Hochfelder,* 29 Stan.L. Rev. 213, 227 n. 99, 235 36, 239 40 (1977).

al arguments for circumscribing the due care requirement.[24] But it balanced the effect of *Ernst* against the general SEC policy of encouraging diligence in stock transactions. As a result, it continued to require that plaintiffs act reasonably, and it made the due care question an affirmative defense. On the facts, the American defendant did not carry his burden of proof primarily because the Europeans lacked access to information concerning the abuse of their trust.

These cases and commentary have developed several reasons for changing the due diligence standard after *Ernst.* They first draw analogies to tort theory. *Holdsworth v. Strong,* 10 Cir. 1976, 545 F.2d 687, 693–95; *Straub v. Vaisman & Co.,* 3 Cir. 1976, 540 F.2d 591, 597; *Wheeler,* 70 Nw. U.L. Rev. at 575. This is not an innovative approach, although a justifiable one for courts attempting to define the scope of judicially created remedies. *See, e. g., Blue Chip Stamps v. Manor Drug Stores,* 1975, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539; *List v. Fashion Park, Inc.,* 2 Cir. 1965, 340 F.2d 457, *cert. denied sub nom.; List v. Lerner,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60, *rehearing denied,* 382 U.S. 933, 86 S.Ct. 305, 15 L.Ed.2d 344; 3 L. Loss, Securities Regulation, 1759–1763; 6 L. Loss, 3880 *et seq.;* Comment, *Negligent Misrepresentations Under Rule 10–b,* 32 U. Chi.L.Rev. 824, 828–33 (1965). Tort law distinguishes between intentional misrepresentations and negligent ones. Contributory negligence may bar recovery for the latter, but not for the former:

> [W]here there is an intent to mislead, [barring recovery] is clearly inconsistent with the general rule that mere negligence of the plaintiff is not a defense to an intentional tort. The better reasoned cases have rejected contributory negligence as a defense applicable to intentional deceit.

W. Prosser, Handbook of the Law of Torts § 10 at 716 (4th ed. 1971) (hereinafter cited W. Prosser). The Restatement of Torts agrees:

> The recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation.

Restatement of Torts § 540 (1938). The American Law Institute rejected any change in this rule when it considered the Restatement Second. *See* 42 ALI Proceedings 331 (1965), *rejecting* Restatement (Second) of Torts § 540 (Tent.Draft No. 11, 1965).

Two theories support the tort law dichotomy. First, the policy of deterring intentional misconduct outweighs that of deterring negligent behavior. This constitutes a change in tort philosophy from the period dominated by the concept of caveat emptor. W. Prosser, § 108 at 717. "The recognition of a new standard of business ethics, demanding that statements of fact be at least honestly and carefully made, and in many cases that they be warranted to be true, has led to an almost complete shift in this point of view." *Id.* Second, comparative culpability influences the determination of who should bear any given loss. When both parties are negligent, there may be no reason for the judicial system to shift the loss from the victim. *See id.* at § 65. When one inflicts a loss intentionally on a negligent victim, however:

> [s]uch conduct differs from negligence not only in degree but in kind, and in the social condemnation attached to it. . . It is in reality a rule of comparative fault which is being applied, and the court is refusing to set up the lesser fault against the greater.

*Id.* at § 65 at 426. Of course, other factors, such as the comparative abilities of the parties to spread losses fairly also influence the allocation decision. Such factors have led to increasing dissatisfaction with the concept of contributory negligence. *See* James, *Contributory Negligence,* 1953, 62 Yale L.J. 691; W. Prosser, § 64 at 418.

The strength of the tort law analogy is enhanced by the similarity of policy argu-

**24.** *See* text at note 25 *infra.*

ments derived from the Securities Acts. Just as principles of tort law are intended to deter intentional misconduct, one of the principal policies behind the Acts is "to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing". *Ernst & Ernst v. Hochfelder,* 1976, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668, *citing* H.R.Rep. No. 85, 73d Cong., 1st Sess., 1–5 (1933). Regarding Section 10b–5 specifically, the *Ernst* opinion, besides limiting the bases on which liability may be imposed, also demonstrates the strength of congressional intent to "prevent 'manipulative and deceptive practices which . . . fulfill no useful function'". 425 U.S. at 206, 96 S.Ct. at 1387, *citing* S.Rep. No. 792, 73d Cong., 2d Sess., 12–13 (1934); H.R.Rep. No. 1383, 73d Cong., 2d Sess., 10–11, 20–21 (1934). The prospect of unreasonable behavior by investors apparently did not generate such concern; at least the legislative history does not speak of it. It is therefore fair to say that the federal policy of deterring intentional misconduct in securities dealings outweighs the policy of deterring negligent behavior by investors.

This argument leads to the conclusion that nothing in the Act requires disregard for the comparative equities of the parties. If it is fairer for a judicially allocated loss to fall upon the more culpable actor under tort law, the judicially created remedial system for the Securities Acts can respond to similar notions of equity without disrupting the legislative scheme.[25]

Still another reason to adhere to this approach is that *Ernst* diminished substantially the need to limit the scope of the 10b–5 remedy. Before *Ernst,* tremendous liability could result from the negligent behavior of any person connected with a stock sale or purchase. For accountants, lawyers, brokers, dealers, and underwriters who handled these transactions, this potential liability posed a substantial risk to their professional existence. The principle of due diligence

and other elements of the private cause of action provide mechanisms for limiting potential liability. *See Clement A. Evans & Co. v. McAlpine,* 5 Cir. 1970, 434 F.2d 100, 104. With the scienter requirement, liability will be imposed only upon reckless or intentional wrongdoers, reducing substantially the risk on most actors in securities transactions. The need, then, for further limitation by the reasonable diligence requirement becomes questionable. Indeed, the Tenth Circuit has argued that requiring proof of both the scienter of the defendant and the reasonable diligence of the plaintiff would impermissibly limit 10b–5 recoveries to the "extraordinary" cases. *Holdsworth v. Strong,* 10 Cir. 1976, 545 F.2d 687, 693.

The final argument for relaxing the reasonable diligence standard after *Ernst* is that most 10b–5 cases, when limited to their facts, are consistent with the distinction between intentional and negligent misrepresentation. In *Carroll v. First National Bank,* 7 Cir. 1969, 413 F.2d 353, *cert. denied,* 1970, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494, for example, the Court said:

whatever the relevance of plaintiffs' negligence might be to the issues at a trial on the merits, it does not support the dismissal of the amended complaint which is based on fraud rather than negligence.

*Id.* at 358. Other cases that required plaintiffs to act reasonably did not require proof of intentional misconduct by defendants. *E. g., White v. Abrams,* 9 Cir. 1974, 495 F.2d 724; *Vohs v. Dickson,* 5 Cir. 1974, 495 F.2d 607; *Arber v. Essex Wire Corp.,* 6 Cir. 1974, 490 F.2d 414; *City National Bank v. Vanderboom,* 8 Cir. 1970, 422 F.2d 221; *Rogen v. Ilikon Corp.,* 1 Cir. 1966, 361 F.2d 260; *Jackson v. Oppenheim,* S.D.N.Y.1974, 411 F.Supp. 659. *See* A. Bromberg, Securities Law-Fraud SEC Rule 10b–5 § 8.4(652) (1971). Indeed, because most cases before *Ernst* did not require scienter, they can be read consistently with the distinction between intentional and negligent misrepresentation cases.[26]

---

25. *But see* Wheeler, 70 Nw.U.L.Rev. at 586.

26. The clearest exception to this general proposition in *McAlpine*:

We consider that *Ernst & Ernst v. Hochfelder* prompts a change in the law of due diligence, as it is applicable in 10b–5 cases. Both tort law and federal securities policy support imposing on the plaintiff only a standard of care not exceeding that imposed on the defendant. Although the "scienter" requirement may still be unsettled, the Supreme Court has imposed on defendants a standard not stricter than recklessness. In this case, then, the question should not be whether Milton acted unreasonably by failing to investigate the condition of Lori Corporation. Instead, the Court should ask whether Milton intentionally refused to investigate "in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." W. Prosser, § 34 at 185 (1971).

### 4. The Due Diligence of Milton.

After reviewing the voluminous trial record, we hold that a reasonable jury could find that Milton did not act recklessly when he sold his stock.

The district court's instructions were, as we view them, more favorable to Clarence than to Milton.[27] The district court instructed the jury that to recover Milton must prove that he acted reasonably, an instruction consistent with previous holdings of this Court. The jury found that Milton had met this burden of proof—that he had acted reasonably; "with due diii-

gence" (the language of the court's interrogatory). After *Ernst*, the jury did not have to decide whether Milton acted negligently, but only that he did not act recklessly. We reinstate the jury's verdict, then, because there is sufficient evidence in the record to support a holding that Milton did not have knowledge of the risk of Clarence's forming the partnership with Monteleone and obtaining financing for the hotel. There is also sufficient evidence to support a jury conclusion that Milton did not act in intentional disregard of whether Clarence had taken this course of action.

Whether Milton knew of the risk of Clarence's having formed a partnership with Monteleone poses a jury question. Milton testified that Monteleone's name arose only once as a possible purchaser of some of Milton's stock. He denies that he ever discussed Monteleone with Harris or Merrigan or Perez. And he insists that Clarence never informed him of the negotiations and partnership. On the other hand, Clarence submits that Milton knew of the possibility of the partnership in March. Harris testified that he discussed with Clarence and Milton the possibility of tapping Monteleone as a source of financing. Merrigan and Perez also recall meetings at which the brothers mentioned Monteleone as an investor. And their mother stated that Milton himself informed her of the partnership. Nevertheless the jury, as the fact finder, assesses the credibility of these witnesses and resolves this factual dispute. *Boeing*

---

While the commentator quoted by the court couched his language in the context of negligent misrepresentations, we are of the view that plaintiff's duty above espoused is not altered merely because the misrepresentations are alleged to be intentional rather than negligent.

434 F.2d at 104. After *Ernst*, however, we view the due diligence rule from a different perspective. To begin with, the above policy arguments, not discussed at all in *McAlpine*, provide substantial support for a change. Furthermore, the *McAlpine* opinion does not indicate whether the plaintiff proved that the defendants had perpetrated an intentional fraud. From the Court's brief factual discussion, *McAlpine* probably intended the deception. But his co-defendants, another stock broker and his firm, may have only acted negligently.

Thus the facts of the case are somewhat distinguishable from *Dupuy*, where the district court expressly conditioned liability on proof of intentional or reckless behavior.

27. The district court instructed the jury, in part:

In addition, he must prove that his reliance was reasonable under all the circumstances at the time.

In this way, recovery is denied those who, because of their business sophistication, their acumen or, ready access to information involved, could reasonably be expected to exercise a higher degree of care and investigation in their dealings and thus, have discovered for themselves, the misrepresentation or omission.

*Co. v. Shipman*, 5 Cir. 1969, 411 F.2d 365, 375. If the jury believed Milton's testimony, then, it could have reasonably concluded that Milton knew nothing of the risk of the partnership having been created.[28]

The traditional factual considerations of due diligence analyses do not require a conclusion contrary to that of the jury. Milton testified that he had no effective access to information about Monteleone. Besides Clarence, knowledge of the partnership could have come only from Merrigan, Harris, or Perez. But, according to Milton, these men did not provide effective access; he had no reason to connect them to a partnership about which he knew nothing. *Rogen v. Ilikon Corp.*, 1 Cir. 1966, 361 F.2d 260, supports his position. The defendants in *Rogen* failed to reveal secret business negotiations and technical developments to the plaintiff before he sold his stock to them. In that case the plaintiff even knew of the possibility of the important business deal. The secret nature of the negotiations, however, prompted the Court to give the access question to the jury. An independent investigation outside the corporation was not required. *See also, Holdsworth v. Strong*, 10 Cir. 1976, 545 F.2d 687. Similarly, because of Milton's lack of effective access to information about the Monteleone transaction, the jury could reasonably have concluded that he did not know of the likelihood that the partnership had been created.

In spite of the friction between the brothers, the jury could reasonably conclude that Milton, holding a 47 percent interest in Lori, could not foresee that the corporation would enter into a partnership with Monteleone and with Clarence individually and assign to the partnership Lori's sole asset. Nor could Milton foresee that this could be accomplished without notice to him of the nonexistent board meeting and of the resolutions that Clarence certified as having been adopted by the board at a lawful meeting. In the past, Milton had co-signed or had known of Clarence's signing resolu-

tions required for their various transactions. Clarence had a month to tell Milton of the good fortune that had benefitted Lori. During this period Milton's health had deteriorated, as a result of which he was no longer able to work.

Clarence argues that a higher standard of diligence should be required of Milton because he was a corporate insider of Lori. Although insider status can influence the due diligence consideration, Clarence does not correctly apply the element to the facts of this case. *Rogen* again suggests the proper application. In that case the plaintiff was the president and co-founder of a small metals research company. The defendants, other co-founders, removed him from office because of dissatisfaction with his performance. After he later sold his stock to the defendants, he alleged that they had failed to reveal important information. The Court approached the due diligence problem by examining whether the plaintiff, as a matter of law, could not have relied on the omissions. The district court had issued a summary judgment order for the defendants on this issue because (a) Rogen was a corporate insider, intimately involved with the development of the small company; (b) he had retained his position on the board of directors after his dismissal as president; (c) he did not investigate the status of the corporation before selling his stock; and therefore (d) he was not interested in the current developments of the company. The Court of Appeals reversed, holding that a question of fact existed and the jury should assess Rogen's reliance because (a) he was not sophisticated in investing; (b) he trusted the other insiders; (c) he thought company employees would not cooperate with him in any investigation; and most importantly (d) he might have lost any meaningful access to information about the company despite his former role and current board position.

The important factors in the district and circuit court opinions in *Rogen* also appear

---

**28.** The price at which Milton's stock was sold—whether he or Clarence told the truth about the price—is strong evidence that he did not know or have reason to think that Clarence had consummated an agreement with Monteleone.

in this case. Both cases involve an insider whose role in the corporation diminished, who retained a corporate title, who did not investigate the company's prospects before selling his stock, and who says he trusted other insiders for information. The lesson of *Rogen* should apply here: The due diligence analysis should not react reflexively to the titles of apparent insiders. The principal consideration should be whether the plaintiff, by virtue of his position, has access in fact to the particular information needed to uncover the fraud. The insider status of a plaintiff has generally been of significance only in those cases when the fraud involved financial data easily available in company books. *See, e. g., Kohler v. Kohler Co.,* 7 Cir. 1963, 319 F.2d 634; *Jackson v. Oppenheim,* S.D.N.Y.1974, 411 F.Supp. 659. But if the pertinent information concerns private negotiations not apparent on the corporate books, or if the insider has lost effective access to information, the significance of his insider status diminishes.[29] Thus a reasonable jury could have disregarded Milton's insider status because of his lack of effective access to information about the Monteleone negotiations and partnership.

The alternative question posed by the recklessness standard is whether Milton acted intentionally in disregard of the probability that Clarence had organized the partnership and obtained financing. Two factors indicate that Milton intentionally sold his stock in disregard of all chances for success. First, the parties agree that the sale occurred without any independent investigation by Milton into the affairs of

Lori. Although he knew Merrigan, Perez, and Harris, he did not discuss the sale with them. He relied exclusively on Clarence's representations. Second, Milton initiated the sale negotiations and exerted pressure for a quick agreement. According to Milton, he first wanted to sell his interest in several other properties to generate cash. Later, in April or May, he suggested a sale of the hotel stock. Clarence put him off; he needed time to raise the money. Clarence reported that their mother first informed him of Milton's desire to sell his interest in the hotel venture. Clarence also said that his mother badgered him about the sale on Milton's behalf until the brothers met in June and, according to Clarence, agreed on a price of $45,000—$35,000 in cash and $10,000 in check. Milton testified that this meeting never occurred; that is, that there was never any firm agreement as to the time or amount. The June and July letters show that Milton distrusted Clarence, wanted to sell, but that Clarence procrastinated.

At least two Courts of Appeals have decided that such conduct indicates a lack of due diligence. In *Kohler v. Kohler Co.,* 7 Cir. 1963, 319 F.2d 634, the plaintiff-seller, the governor of Illinois, pressed for a speedy sale because he wanted to avoid any political problems that company labor conflict might generate. This pressure in part led the court to approve conduct by the defendant "that might not be fair if plaintiff had been a novice to stock transactions or the corporation's activities". *Id.* at 642. Under the flexible duty approach announced in *White v. Abrams,* 9 Cir. 1974,

---

29. The principal 10b–5 case cited by Clarence for his insider argument is *Myzel v. Fields,* 8 Cir. 1967, 386 F.2d 718. Although *Myzel* notes the importance of both insider status and business sophistication, it held that the diligence of the plaintiff in the case created a jury question. The dispositive fact was the skillfulness of the fraud perpetrated by the defendants. The defendants had concealed the true identity of the purchaser of the stock sold by the plaintiff. Because they had developed a convincing scheme, the Court refused to say as a matter of law that a sophisticated, corporate insider should have uncovered misrepresentation by Clarence. And we cannot say as a matter of

law that Milton was reckless in his failure to uncover the Monteleone partnership.

As *Myzel* indicates, an argument similar to Clarence's position on the insider status of his brother can be made regarding Milton's business sophistication. *See, e. g., Straub v. Vaisman & Co.,* 3 Cir. 1976, 540 F.2d 591; *Clement A. Evans Co. v. McAlpine,* 5 Cir. 1970, 434 F.2d 100. But the cases indicate that the effect of sophistication is diminished substantially by a lack of effective access to information. *Rochez Bros. v. Rhoades,* 3 Cir. 1974, 491 F.2d 402; *Lehigh Valley Trust Co. v. Central National Bank,* 5 Cir. 1969, 409 F.2d 989; *Myzel v. Fields,* 8 Cir. 1967, 386 F.2d 718.

495 F.2d 724, initiation of the sale can cut for or against either party, depending on the peculiar facts of each case.

On the facts of this case, however, a jury could find justification for Milton's conduct. First, according to his testimony, he repeatedly discussed the corporation and the stock sale with Clarence, the only other principal of Lori and the most obvious source of information about the venture.[30] Even the cases that have required plaintiffs to refrain from negligent, rather than reckless, behavior have never required a plaintiff to launch an investigation of sources of information outside the corporation, its officers, directors, and books. *See, e. g., Rogen v. Ilikon Corp.*, 1 Cir. 1966, 361 F.2d 260; *Kohler v. Kohler Co.*, 7 Cir. 1963, 319 F.2d 634; *Jackson v. Oppenheim*, S.D.N.Y.1974, 411 F.Supp. 659.

Second, the time that Milton could devote to any such investigation was limited by his search for employment and later by the substantial amount of traveling required by the new job. The jury could have attributed Milton's failure to investigate fully to the financial chaos imposed on him by the abrupt cutoff of his income in March.

Third, the physical debilitation and emotional stress of Milton's kidney disease distracted him significantly during July and August. After discovering the disease in 1965, physicians notified both Milton and Clarence that it was incurable. By August 1972 it had worsened to the point that Milton was forced to quit his new job and to apply for social security. The social security office dated his complete disability from April 1972. When the jury concluded that Milton had exercised due diligence, it is not unreasonable to assume it found that Milton's condition precluded him from investigating the status of Lori. Nothing in the case law forbids or compels the jury to excuse his decision not to investigate on such a ground. Because of the subjective nature of the due diligence determination, then, Milton's ailment could have justified the jury's response to the fourth interrogatory.

The jury found that Milton had acted reasonably in the circumstances when he sold his stock. Implicit in the verdict is the conclusion that he did not act recklessly, which is all that due diligence element requires after *Ernst*. Because we find sufficient evidence to hold that the jury could reasonably have found that Milton was not reckless, we reverse the judgment n. o. v. of the district court[31] and reimpose liability on

---

**30.** Milton argues that because Clarence was his brother and lawyer, he was justified in relying on Clarence. Despite the presence of these special relationships, the record also suggests that Milton did not trust his brother after June 1972. In particular, the three letters to Clarence in June and July accused Clarence of a variety of improprieties and threatened legal and political action. The July letter expressly warns that Milton might soon retain a lawyer. Thus any argument that Milton trusted Clarence because of their attorney-client relationship must be viewed with considerable skepticism. The letters also indicate that Milton considered their harmonious business partnership terminated. Of course, they remained brothers, but Milton even revealed considerable hostility about Clarence's treatment of the family.

This Court recognizes both fiduciary and quasi-fiduciary relationships as relevant to the due diligence decision. *Bird v. Ferry*, 5 Cir. 1974, 497 F.2d 112; *Clement A. Evans & Co. v. McAlpine*, 5 Cir. 1970, 434 F.2d 100. Although *McApline* did not apply either element to the facts of the case, *Bird* did discuss the application of a quasi-fiduciary relationship. The

founder of an investment club in *Bird* had used club assets for personal speculation and had intentionally misrepresented the financial condition of the organization. The Court did not consider the founder a trustee, but it did decide that the club members had entrusted their investments to his financial judgment. Such entrustment, encouraged by the defendant, created a quasi-fiduciary relationship that permitted the investors to be less diligent than the Court would otherwise have approved.

Because this case is distinguishable from *Bird*, we do not rely on the theory that a fiduciary or quasi-fiduciary relationship existed between Milton and Clarence at the time of the sale.

**31.** As an alternative ground of support for the judgment n. o. v., Clarence argues that Milton's cause of action is barred by the statute of limitations. Because the federal securities laws do not contain a statute of limitation, the period that the forum state applies to the state remedy bearing the closest substantive resemblance to Rule 10b–5 should be utilized. *Sargent v. Genesco, Inc.*, 5 Cir. 1974, 492 F.2d 750;

Clarence for a violation of the duties established by Rule 10b–5.

## III.

## DAMAGES

The district court stated that it would grant a new trial on damages as an alternative resolution to the judgment n. o. v.[32] A trial court has the discretion to order a new trial when it determines a verdict to be "against the clear weight of the evidence". *National Car Rental Systems, Inc. v. Better Monkey Grip Co.*, 5 Cir. 1975, 511 F.2d 724, cert. denied, 423 U.S. 894, 96 S.Ct. 193, 46 L.Ed.2d 126 and 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303. *United States ex rel. Weyerhaeuser Co. v. Bucon Construction Co.*, 5 Cir. 1970, 430 F.2d 420. Appellate review is

limited to the question whether the grant constitutes a clear abuse of discretion. *Id.* The discretion of the lower court extends to the grant of a new trial on damages. *Willitt v. Purvis*, 5 Cir. 1960, 276 F.2d 129.

■ The district court correctly instructed the jury on the issue of damages. It limited the jury to the consideration of the actual damages suffered by Milton, as required by section 28(a) of the Act, 15 U.S.C. § 78bb(a) (1970). *Accord, Affiliated Ute Citizens v. United States*, 1972, 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741; *Richardson v. MacArthur*, 10 Cir. 1971, 451 F.2d 35; *Myzel v. Fields*, 8 Cir. 1967, 386 F.2d 718, cert. denied, 1968, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143. Generally, a defrauded seller may recover the difference between the price for which he sold his

citing *Azalea Meats v. Muscat*, 5 Cir. 1967, 386 F.2d 5. Clarence urges the application of the one-year prescription employed in La.Civ.Code art. 3536. The article is a catch-all provision that does not mention fraud or misrepresentation actions. It applies in part to "offenses and quasi offenses". The only case slightly resembling a 10b–5 action to have utilized the article is *Brown Shoe Co. v. Unter*, La.App.1937, 173 So. 579, which involved the fraudulent procurement of credit. No case under the provision has concerned stock fraud.

A closer analogy can be drawn between Rule 10b–5 and the Louisiana Blue Sky statute, La. Rev.Stat.Ann. § 51.715A(3) and E, which specifically limits the period of potential liability of:

Any person who:

. . . . .

Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . .

The statute promotes the full and accurate disclosure of information in connection with stock sales, precisely the same purpose as that of Rule 10b–5. There are two differences between the section and the Rule: The Louisiana law prohibits only misrepresentations by sellers, and it measures the conduct of defendants against a negligence standard of care. Even with these distinguishing features, however, the Blue Sky statute still bears a closer resemblance to Rule 10b–5 than a catch-all provision dealing with the variety of offenses and quasi offenses in the Louisiana Code. *Accord, Hudak v. Economic Research Analyst, Inc.*, 5 Cir. 1974, 499 F.2d 996, cert. denied, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821; *Parrent v. Mid-*

*west Rug Mills, Inc.*, 7 Cir. 1972, 455 F.2d 123; *Vanderboom v. Sexton*, 8 Cir. 1970, 422 F.2d 1233, cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90. Consequently, Milton's claim is not barred by the two-year Blue Sky statute of limitations because he filed his action before August 29, 1974.

**32.** The district court explained from the bench:

I will state for the record, although this is not directly before me, that if it were not for the Court's liability to make this finding in the fashion that I have, I would feel compelled to grant a new trial, because I feel that under all of the circumstances of the case, the size of the verdict . . . shock[s] the Court's conscience and also [is] contrary to the weight [of the evidence]. I would grant a new trial rather than a remittitur, because I feel that it would be unfair to both sides for the Court to substitute its own judgment.

Clarence argues that this announcement grants a new trial on the liability issues as well as on damages. His only basis for the assertion is the argument that the phrase "also [is] contrary to the weight" applies to the liability verdict rather than to the decision on damages. We disagree. The phrase is in no way connected grammatically to the question of liability. In addition, the sentence immediately following the phrase shows that the district court considered a remittitur as an alternative response to granting a new trial. This would be an alternative only if the new trial order were limited to the damage issue. The district court decided against a remittitur because it did not want to substitute its judgment for that of the jury, rather than because a remittitur could not adequately conform the jury's verdict on liability to the weight of the evidence.

stock and the price he would have received absent the misrepresentation or omission. *Affiliated Ute Citizens v. United States,* 1972, 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741; *Thomas v. Duralite Co.,* 3 Cir. 1975, 524 F.2d 577. To determine the true value of the stock, subsequent developments may be considered. The jury may consider whether the plaintiff would have held onto his stock absent the misinformation. If the jury decides he would not have consummated the sale, it may then award the difference between the sale price and the value of the stock at a reasonable time in the future. *Myzel v. Fields,* 8 Cir. 1967, 386 F.2d 718; *Janigan v. Taylor,* 1 Cir. 1965, 344 F.2d 781, *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120. Such a rule conforms to the reasoning of *Bird v. Ferry,* 5 Cir. 1974, 497 F.2d 112, which approved an award of damages based on value rather than out of pocket expense. The plaintiff, an investment club, had lost money given to the defendant, a securities salesman, for investment. The Court approved the somewhat speculative damage award that allowed recovery of the value the investments would have attained had the salesman followed the instructions of the club:

> We see nothing inappropriate in the court's use of a measure of damages calculated to restore the club to the position it would have occupied had the defalcations not occurred.

*Id.* at 113. Applied to a defrauded seller, this theory would allow a jury to consider the value the stock attained within a reasonable time after the sale.

■ After correctly instructing the jury, the district court found the $905,000 verdict to be against the weight of the evidence. We cannot say that this is an abuse of discretion.[33] Based on the various computations by the valuation experts, $905,000 appears to be half of what one expert calculated as the "equity" of the hotel. A preconstruction appraisal set the value of the completed hotel at $7,160,000. The hotel cost $5,350,000 to construct. By subtracting the two, a net equity figure of $1,810,000 appears. Half of that is $905,000. By rejecting this total, the trial court did not abuse its discretion; the figure does not take into account discounts normally evaluated in the appraisal of close corporation stock. For instance, Milton's own experts reached values substantially below the verdict when they considered the various discounts. Albert Derbes evaluated the stock by comparing Milton's shares to the twenty percent share of the partnership purchased by Monteleone for $600,000. When discounts for both the tax benefits of the Monteleone investment and the minority status of Milton's stock were considered, Derbes reached a value of $460,000. When only the tax benefits were discounted, the figure rose to only $658,000. Arguably, at the time Milton sold his stock there were other possible risks such as the prospect that the hotel, which was on the edge of the main tourist section of the French Quarter, might have difficulties because of its location. Moreover, a large number of hotels were either under construction or in the planning stage in New Orleans. Had Milton kept his stock, the evidence suggests that he would have been required to endorse the construction note. A failure would have left him personally liable for the loan. The district court could have reasonably concluded that such factors should have reduced the value of Milton's stock below $905,000. At least, the district court would not abuse its discretion by concluding that the weight of the evidence required such factors to be included in the calculation of damages.

## IV.

## CONCLUSION

We hold that a reasonable jury could have found that, in the circumstances of this case, Milton Dupuy exercised due diligence in the sale of his stock to Clarence Dupuy. The judgment notwithstanding the verdict of the district court is therefore reversed, and the district court is instructed to reinstate the verdict on Clarence Dupuy's

---

**33.** We do not embrace any particular damage figure.

liability. By ordering a new trial on damages,[34] in the alternative, the trial court did not abuse its discretion. The case is therefore remanded to the district court for a new trial on damages.

REVERSED in part and AFFIRMED in part and REMANDED.

---

**34.** As part of his argument for a new trial, the appellee challenges the scienter instruction of the trial court. Because the appellee did not cross-appeal, however, this issue is not properly before the Court and is not included in our remand for a new trial. The district court ordered a new trial only on damages. To award a new trial on liability, then, would alter substantially the rights of the parties under the lower court ruling. Such a change may occur only on cross-appeal. *See United States v. American Ry. Exp. Co.*, 1924, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087; *Lettsome v. United States*, 5 Cir. 1970, 434 F.2d 907.